**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

MARCO PACELLI and ED CRUMP,    )
                               )
        Plaintiffs,            )
                               )
    v.                         )    Case No.: _____
                               )
AUGUSTUS INTELLIGENCE, INC.,   )
                               )
        Defendant              )
_____)

## COMPLAINT OF PLAINTIFFS MARCO PACELI AND ED CRUMP

Plaintiffs, Marco Pacelli ("Pacelli") and Ed Crump ("Crump") (together "Plaintiffs"), by and through undersigned counsel, file this suit against Defendant Augustus Intelligence, Inc. ("Augustus Intelligence"), and state as follows:

## INTRODUCTION

1.      This case is about the fraud Augustus Intelligence perpetrates against its employees, investors, customers, and others. Augustus Intelligence holds itself out as the next groundbreaking technology company, replete with rich funding, state-of-the-art patented technology, and skyrocketing revenues. Look behind the curtain, however, and Augustus Intelligence's business practices are permeated with fraud, illegality, and corruption. Augustus Intelligence claims to have tens of millions of dollars in seed funding, touting a $50 million dollar value contribution from an investor who Plaintiffs later learned never put a dime into the company. It promotes a proprietary artificial intelligence product when its cobbled-together demos are based on open source code available to the public. It even instructed its employees to bring their friends and acquaintances into the office to pose as employees to give visiting prospective investors and customers the impression of a busy, well-staffed operation.

72233091.2

2.      Pacelli and Crump are two of the victims of these frauds.  Pacelli and Crump are renowned figures in the tech start-up community, having formed companies with billions of dollars in real revenue, contributed to dozens of real patents, and invented real tech products used by millions of consumers.  Augustus Intelligence sought out Pacelli and Crump to use their names and reputations as respected industry figures to bolster its own credibility.  Augustus Intelligence made glowing representations about the status of its supposedly 80% complete visual detection artificial intelligence product, based on patented technology, that was ready to market and sell to customers.   It claimed it had rich seed funding, and promised Pacelli and Crump large compensation packages and substantial equity.  Augustus Intelligence's representations were false and the bulk of its promises have been broken.

3.      Pacelli joined as Augustus Intelligence's Chief Commercial Officer, and promised leadership of the company's sales and business development efforts as well as a primary role in shaping its product development.  Pacelli introduced numerous potential customers to Augustus Intelligence and also presented the company with acquisition opportunities to acquire additional technology and talent.  Crump joined as the Head of Product involved in building Augustus Intelligence's product development team and leading its product development.  Unfortunately, Augustus Intelligence seemed mainly interested in using Pacelli's and Crump's names to promote itself, and marginalized Pacelli and Crump by failing to provide them the promised resources or authority, cutting them off from information about the company, and failing to pay their promised monetary and equity compensation.

4.      When Augustus Intelligence was facing huge revenue shortfalls in late 2019 from the projections it gave investors, it decided to paint Pacelli and Crump as the scapegoats.  Augustus Intelligence trumped up a fake "cause" for termination based on activities Pacelli and Crump had

72233091.2

previously disclosed to Augustus Intelligence and had been approved to conduct. It tried to extort another employee to provide false information about alleged wrongdoing by Pacelli and Crump by sequestering him in a conference room and threatening him with criminal prosecution. When Pacelli and Crump refused to go along with the charade and insisted on being paid the substantial monies Augustus Intelligence owed them, it filed a baseless lawsuit falsely claiming they misappropriated customers and confidential information. Augustus Intelligence then sought to defame Pacelli and Crump to their business contacts, making knowingly false statements about Pacelli's and Crump's alleged misappropriation of customers and intellectual property.

## PARTIES

5.    Pacelli is an adult citizen of the State of Florida who is competent to bring this action.

6.    Crump is an adult citizen of the State of California who is competent to bring this action.

7.    Augustus Intelligence is a corporation organized under the laws of the State of Delaware that has its principal place of business in the State of New York.

## JURISDICTION AND VENUE

8.    This Court has subject-matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.00 and there is complete diversity of citizenship between the parties.

9.    Augustus Intelligence is subject to personal jurisdiction in this Court pursuant to N.Y. CPLR §§ 301 and 302(a)(1) and (2) because Augustus Intelligence has its principal place of business in the State of New York, transacted business with Plaintiffs to supply products in the State of New York, and committed tortious acts in the State of New York.

72233091.2

10.     Venue is proper in this Court pursuant to, *inter alia*, 28 U.S.C. § 1391(b)(1) and (2) because Augustus Intelligence has its principal place of business in the State of New York and the events giving rise to Plaintiffs' claims occurred in the State of New York.

## FACTS COMMON TO ALL COUNTS

11.     According to Augustus Intelligence's own marketing materials, Pacelli is a "globally respected data and analytics expert" who has served "as Founder and CEO of five technology companies representing over US$250mm in capital raised and a combined US$1.4B in annual recurring revenue prior to their successful exists."

12.     Crump is an established entrepreneur and a veteran product developer whose work is embodied in over three dozen patents.  Crump was one of the original members of the Amazon team that built the phenomenally successful Alexa/Echo line of products.

13.     Wolfgang Haupt is Augustus Intelligence's co-founder and Chief Executive Officer.

14.     Karl-Theodor zu Guttenberg is a former German defense minister who is a member of Augustus Intelligence's Board of Directors.  He has been involved in Augustus Intelligence's business on a full-time basis since at least September 2019.

15.     Charles-Edouard Bouee became Augustus Intelligence's President in October 2019, but has been involved with the company since at least July 2019.  Upon information and belief, Bouee lacks the required immigration authorization to work in the United States, but regularly performs services for Augustus Intelligence from its New York City office.

16.     Pascal Weinberger is Augustus Intelligence's co-founder and Chief of AI.  Upon information and belief, prior to April 2019, Weinberger also lacked the required immigration status to work in the United States but did so anyway.

72233091.2

17.     Haupt, Guttenberg, and Weinberger are key players and conspirators in Augustus Intelligence's efforts to defraud Plaintiffs and others.

18.     Pacelli first learned of Augustus Intelligence in or about December 2018 through a mutual acquaintance of Haupt and Weinberger. Augustus Intelligence was looking to affiliate with senior tech leaders like Pacelli to bolster its credibility in the industry.  In January 2019, Pacelli met with Haupt and Weinberger, who pitched him on the company's supposedly rich funding and cutting edge technology.  They told Pacelli that Augustus Intelligence's visual tool box was 80% complete and was in a state that could immediately be sold and implemented with customers.  They also told Pacelli that a client called SGS Switzerland had purchased Augustus Intelligence's product and had a $2.5 million annual contract with Augustus Intelligence.  In fact, this client had only conducted a pilot test of Augustus Intelligence's product.  The pilot used jury-rigged software built specifically by Weinberger for the pilot as Augustus Intelligence has no existing artificial intelligence toolbox that could be implemented for customers on demand in a replicable manner. Based on these and other misrepresentations, in February 2019, Pacelli began performing services for Augustus Intelligence on a part-time basis.

19.     Pacelli's independent contractor agreement with Augustus Intelligence anticipated that he might become employed by Augustus Intelligence after its ninety day term.  Specifically, the independent contractor agreement provided that Pacelli would assume a senior executive role reporting to Augustus Intelligence's CEO with attendance at Board of Directors meetings.  The independent contractor agreement also contemplated that Pacelli would receive a substantial equity position in Augustus Intelligence, including options to purchase 2.5% of Augustus Intelligence's equity and additional performance based options valued at $500,000.  Pacelli agreed to these terms

72233091.2

because Haupt and Weinberger fraudulently represented to him that Augustus Intelligence had substantial existing customers that were using an actual proprietary product of the company.

20.      The representations to Pacelli about the status of Augustus Intelligence's customers and product were important to Pacelli.  As noted above, Pacelli has a strong reputation in the tech community and a deep network of business contacts who trust his advice and guidance.  If he had been aware of Augustus Intelligence's misrepresentations and other fraudulent contact, he would not have foregone other opportunities to associate with the company.

21.      The terms of Pacelli's independent contractor agreement were also consistent with and reflective of his strong desire, as an established entrepreneur, to receive a substantial equity interest that could provide a significant financial upside.

22.      Crump first was introduced to Augustus Intelligence through a longtime friend employed by the company.  In or about the spring of 2019, Crump met with Augustus Intelligence's executive team to obtain information regarding its business and supposed product. At that time, Augustus Intelligence represented to Crump that it had $72 million in funding and a fully-developed product that it had acquired through the purchase of another start-up.  Based on these representations, Crump agreed to work with Augustus Intelligence, at first in the capacity of an independent contractor.

23.      On April 19, 2019, Crump executed an engagement letter to perform services for a 90-day term on a part-time basis as an independent contractor.  In addition to a monthly retainer fee, Augustus Intelligence agreed that "Stock Options will be awarded at the end of the 90 day period in the value of $100,000."  Augustus Intelligence never provided Crump with these stock options.

72233091.2

24.     Nothing in Crump's April 19, 2019 independent contractor agreement precluded him from being involved in other ventures or required him to work exclusively with Augustus Intelligence. Crump informed Augustus Intelligence that he was working with other clients when he was an independent contractor for the company.

25.     Pacelli planned to terminate his relationship with Augustus Intelligence at the conclusion of his three-month consulting period, but Haupt and Weinberger pitched Pacelli on staying with the company.  Haupt again made glowing representations about Augustus Intelligence's funding and the status of its technology.  During these meetings, Pacelli provided Augustus Intelligence with ideas for two new products that would be immediately marketable to C-suite executives and, unlike Augustus Intelligence's supposed product, were not duplicative of other offerings available in the marketplace.  Haupt promised that Augustus Intelligence would immediately budget funds to develop and build these products, but never did so.

26.     In reliance on Haupt's and Weinberger's false representations, Pacelli executed an employment agreement with Plaintiff on July 13, 2019.  Pursuant to that agreement, Pacelli was appointed to the position of Chief Commercial Officer, and he was promised by Haupt and in his employment agreement that he would be given authority over Augustus Intelligence's product development, marketing, and every aspect of revenue generation.  Pacelli became a member of Augustus Intelligence's Executive Committee (ExComm) and attended weekly phone calls among Augustus Intelligence's top leadership. Pacelli was also promised that Augustus Intelligence would hire a marketing, sales, and business development staff, which Pacelli would lead.

27.     In addition to a base salary, Pacelli was also promised a signing bonus in the amount of $300,000.  The signing bonus was to be paid in two tranches, with the first tranche due upon the commencement of his employment and the second due approximately 183 days later.

- 7 -

72233091 2

28.    Pacelli was also promised commissions of 5% or 7% on certain types of revenues from engagements Pacelli was involved in developing.  Pacelli would not have agreed to a commission-based compensation structure had Haupt honestly disclosed the status of Augustus Intelligence's product.

29.    Augustus Intelligence promised that Pacelli would also receive stock options in the total amount of 2.5% of Plaintiff's authorized fully diluted equity.  Augustus Intelligence never issued these stock options to Pacelli.  Nor did it issue the $500,000 in performance based options previously promised in Pacelli's independent contractor agreement.

30.    On or about July 17, 2019, Pacelli, Crump, and two other individuals incorporated Quantum Intelligence, LLC ("QI").  QI was originally conceived by Paul Zaragoza, a friend and business associate of Crump and QI's fourth member, who was acting as an independent contractor for Plaintiff with responsibility for finding potential deals with investors and other start-ups.

31.    Zaragoza had brought several start-ups to Augustus Intelligence as potential customers or acquisition targets to acquire products developed by those start-ups since Augustus Intelligence failed to develop its own product.  Augustus Intelligence passed on all of these opportunities.  Pacelli had similarly introduced start-ups and other companies to Augustus Intelligence as potential customers, but Augustus Intelligence did not seriously pursue most of the deals.

32.    Zaragoza and Pacelli noted that these and other start-ups in their networks faced common challenges and needed similar advice about raising investments, assessing their technology, and managing their business operations. Both Zaragoza and Pacelli, as well as Crump, operated as formal or informal advisors to start-ups about these types of matters, in return for

which they frequently received small equity stakes in the start-ups.  Several of these start-ups were presented to Augustus Intelligence as potential investment, acquisition, or customer opportunities.

33.    Because Zaragoza, Pacelli, Crump, and the fourth individual involved in QI had complementary skillsets in the areas of finance, technology, and business development, they determined that it was advantageous to pool their efforts and establish a single holding LLC, QI, to hold the various equity stakes they received for advising other start-ups.

34.    All of these discussions between Zaragoza, Pacelli, Crump, and the fourth individual occurred prior to the execution of Pacelli's or Crump's employment agreements with Augustus Intelligence.

35.    QI was not competitive with Augustus Intelligence.  Unlike Augustus Intelligence, QI was not seeking to develop or offer any proprietary artificial intelligence product to sell to customers.  QI was providing financial, operational, technical and data monetization advice to start-ups and serving as board members and general advisors.  If anything, the two companies are complimentary because when QI worked with start-ups who needed an artificial intelligence product along the lines of the product Augustus Intelligence was supposedly developing, Pacelli referred that potential customer to Augustus Intelligence.  No QI client was ever referred to any competitor of Augustus Intelligence.

36.    On July 19, 2019, Zaragoza met with Haupt and another of Augustus Intelligence's executives, Luis Navia, and presented Augustus Intelligence with the opportunity to undertake QI's business model under the moniker "Augustus Labs."  During this meeting, Zaragoza expressly disclosed that QI had been formed to undertake this business if Augustus Intelligence was not interested in the opportunity.  Zaragoza later provided Augustus Intelligence with a

72233091.2

presentation deck outlining the business model. Augustus Intelligence never followed up with Zaragoza or pursued the opportunity.

37.     Crump executed an employment agreement on September 10, 2019 and joined Augustus Intelligence as a full-time employee on September 16, 2019. As Head of Product, Crump was responsible for guiding Plaintiff's development of its artificial intelligence product. Crump's position was referred to by Plaintiff in internal materials as "Chief Product Officer," and his duties and responsibilities were equivalent to those commonly performed by individuals with the title Chief Product Officer across the industry. Like Pacelli, Crump also participated in ExComm calls.

38.     During negotiations with Augustus Intelligence, Crump insisted upon an annual salary of $500,000. Augustus Intelligence agreed to provide this compensation, but stated that investors would question the presence of such a large salary on its books. Accordingly, Augustus Intelligence proposed (and Crump agreed) to split the $500,000 into three portions: a $200,000 base salary, $180,000 signing bonus (payable in two tranches), and four $30,000 quarterly bonuses.

39.     Augustus Intelligence also promised to award Crump stock options that would have made him one of its ten largest shareholders. Augustus Intelligence never awarded these options. As with Pacelli, it was essential to Crump in assessing his employment options that he receive a substantial equity stake in his employer that could be monetized in the event of a successful exit.

40.     Crump's employment agreement explicitly recognizes that he would "from time to time, engage as an Advisor for other companies." Crump similarly disclosed to Augustus Intelligence in writing that he was a founder of QI (identified by the misnomer "Quantum Intelligence Advisors, Inc.") through which he provided corporate due diligence and fund raising services. Crump also disclosed in writing his roles as a founder, officer, or advisor with four other

start-ups in the related machine learning field. Augustus Intelligence expressly agreed the disclosed "roles, positions and interests . . . will not be considered to be in conflict with [Crump's] employment with the Company." Although Augustus Intelligence had the opportunity to ask Crump about the outside activities he disclosed, it never did so prior to agreeing that they did not present conflicts.

41.    After they started working for Augustus Intelligence as full-time employees, Crump and Pacelli began to discover that many of the representations that had been made to them about Plaintiff's technology and funding were untrue.

42.    One of the first troubling developments took place when Haupt and Weinberger brought potential investors to visit Augustus Intelligence's office. Haupt and Weinberger asked employees to bring friends and acquaintances to sit in Augustus Intelligence's office as if they were employees of the company in order to mislead the potential investors concerning the number of Augustus Intelligence's employees.

43.    Crump was led to believe that Augustus Intelligence was well-funded, having raised over $72 million in a seed financing round. After he started working for Augustus Intelligence, however, he began to hear shifting and inconsistent accounts of this funding. First, he was told that a certain investor had contributed $50 million in funding, of which $20 million was cash and the remaining $30 million was an in-kind contribution of the use of data centers controlled by the investor. Later, Crump learned that Augustus Intelligence represented to other investors that the entire $50 million was invested in-kind. Subsequently, a third story emerged that the investment was still under negotiation. Finally, Crump heard after Augustus Intelligence filed this lawsuit that the investor had never made any monetary or in-kind investment in Augustus Intelligence.

72233091.2

44.    Haupt and others regularly touted these alleged funding totals to existing and prospective employees in interviews and company meetings to try to project an aura of success around Augustus Intelligence. In fact, the company did not have this funding, did not have a product, and did not have substantial customers or revenues.

45.    Augustus Intelligence also made false representations about the status of its technology and assets. Pacelli was told that Augustus Intelligence had a functioning, proprietary artificial intelligence and machine learning toolbox ready for him to market on "day one." In fact, Augustus Intelligence did not have any functioning, proprietary product. It only had two demos that were developed using open source software available to anyone in the industry or general public. There was no prepared product and Augustus Intelligence's team would have to build a new demo every time Pacelli pitched a potential customer.

46.    Crump was similarly told that Augustus Intelligence had existing technology. Prior to joining Augustus Intelligence as an employee, Crump was told that Augustus Intelligence had purchased another start-up and acquired its technology. After joining as an employee in September 2019, however, Crump also discovered that Augustus Intelligence had no proprietary technology and was using open source software to run its demos. Augustus Intelligence would misrepresent to potential investors and clients when it ran these demos that the demos were built using proprietary technology.

47.    During investor and customer meetings and pitches, Crump would be upfront with potential customers about the status of the product and the fact that it was not currently ready to implement. Crump learned that his honest disclosures conflicted with those made by other Augustus Intelligence executives when Crump was not present. Crump noted that Augustus

72233091.2

Intelligence began to freeze him out of investor meetings, and when he was invited to meetings, he was instructed to only discuss his general background with potential investors.

48.    Crump discovered that Augustus Intelligence's product development team was inexperienced and under-resourced.  The technology and products that Augustus Intelligence marketed itself as having were aspirational and non-existent, and the technology it did have was not unique or proprietary and was no different than technology Crump had developed and worked with for other start-ups.

49.    On November 6, 2019, Augustus Intelligence announced to employees a major pivot in its business model.  Where Augustus Intelligence had previously focused on selling customers a proprietary artificial intelligence product, it now would rebrand itself as AI+ and provide professional consulting services as an "AI Curator" using third-party products.  Upon information and belief, Augustus Intelligence was forced to undertake this pivot because it was unable to develop any proprietary product of its own to market to customers.

50.    During the same meeting, Augustus Intelligence announced that Bouee would be the company's new President.  It also announced the hiring of a new revenue and sales officer who would report directly to Bouee, despite the fact that Pacelli had been promised authority over marketing, sales, and revenue.

51.    The November 6, 2019 meeting capped off Pacelli's marginalization within Augustus Intelligence.  Not only did Haupt ignore Pacelli's product recommendations, despite earlier promising he would immediately budget funds for their production, but Haupt and Weinberger consistently held meetings with potential clients and partners, some of whom were contacts of Pacelli, without involving Pacelli or inviting him to participate.  Haupt also failed to

hold regular meetings with Pacelli as promised and did not invite Pacelli to participate in Board of Directors meetings.

52.     In late November 2019, Pacelli met with Haupt, Bouee, and Guttenberg to discuss his role within the company following the pivot.  At the meeting, Pacelli expressly disclosed that he was involved in providing advisory services to other start-ups through QI.  Each of the three executives stated that they had no problem with Pacelli's involvement with QI.  In fact, each of Haupt, Bouee, and Guttenberg had their own outside roles and ventures in which they were involved, which Augustus Intelligence tolerated.  Some of Bouee and Guttenberg's outside investments and consulting ventures involve artificial intelligence companies that Augustus Intelligence considers competitors. No one ever discussed QI with Pacelli again prior to his termination.

53.     Upon information and belief, as 2019 reached its end, Augustus Intelligence was severely short of meeting the revenue projections it had promised to potential investors.  In financial documents provided to potential investors, Augustus Intelligence had projected total 2019 revenue of nearly $100 million and an EBITDA figure in the tens of millions of dollars.  In fact, upon information and belief, Augustus Intelligence's actual 2019 revenue and EBITDA fell significantly short of these projections by tens of millions of dollars.    Far from nearing $100 million, upon information and belief, Augustus Intelligence represented to the United States government in immigration forms that its annual revenue was between $0 and $3 million.

54.     Going into December 2019, Augustus Intelligence also had several substantial payments due to Crump in the coming months.  Augustus Intelligence owed Crump the remainder of his $500,000 total compensation package, including a $30,000 quarterly bonus due in early December 2019 as well as a second quarterly bonus and the second tranche of his signing bonus

72233091.2

in March 2020. Augustus Intelligence would also owe Pacelli substantial commissions on revenue generated through Augustus Intelligence's acquisition of Moblty, which likely would have been in the millions of dollars over the client deployment period. Augustus Intelligence was also required to award Pacelli and Crump significant amounts of equity pursuant to the terms of their employment agreements.

55.    Upon information and belief, to avoid blame for their own failures and seek to avoid making these substantial payments and equity awards, Augustus Intelligence trumped up baseless allegations about QI to create a pretextual "cause" for Pacelli's and Crump's terminations. In fact, QI had been fully disclosed to Augustus Intelligence in July 2019 by Zaragoza, in September 2019 by Crump, and in November 2019 by Pacelli. In no instance did Augustus Intelligence express any concern about alleged competition or conflicts of interest. Although Zaragoza offered QI's business model as a revenue generation opportunity for Augustus Intelligence, the company rejected the proposal. Even before Crump's and Pacelli's terminations, Augustus Intelligence did not question or seek to question Crump, Pacelli, Zaragoza, or the fourth founder of QI about QI's business to determine if any conflict existed.

56.    On December 10, 2019, Guttenberg instructed Pacelli to call off a planned meeting the next day with the Department of Veterans Affairs to pitch Augustus Intelligence, and instead come to Augustus Intelligence's New York City office. Following the pattern of lies, Guttenberg told Pacelli that he needed to speak with him about a business opportunity he wanted Pacelli to manage. Mr. Guttenberg also separately instructed Crump to meet at its office on December 10, 2019, claiming that he wanted to discuss a secret project.

57.    Augustus Intelligence held separate meetings with Pacelli and Crump on December 10, 2019. Guttenberg, Ramsey Taylor (Augustus Intelligence's General Counsel), and the

company's outside counsel conducted the meeting with Pacelli.  No member of Augustus

Intelligence's human resources was present and Pacelli was not given the opportunity to have legal

counsel present.  Guttenberg accused Pacelli of competing with Augustus Intelligence based solely

on a draft QI presentation dated October 15, 2019 that had never been presented to any client or

potential client and was an obsolete version of QI's slide deck.  Guttenberg did not show specific

portions of the draft presentation to Pacelli or ask him any questions to try to obtain information

about QI or the draft presentation.  Instead, they summarily dismissed him, claiming Pacelli was

being terminated for cause under his contract.  Guttenberg further threatened that if Pacelli did not

sign documents regarding a potential lawsuit against him by Augustus Intelligence, the company

would pursue state and federal prosecution and arrest.

58.     Crump's meeting followed the same script.  Crump met with Guttenberg, Bill

Webster (Vice President for Human Resources and Finance), and Guttenberg's adjunct.  Bouee

was also present by videoconference.  Webster claimed that Augustus Intelligence had detected

malfeasance, but did not mention any specific acts of misconduct.  Webster referenced the draft

QI presentation, which Crump had not seen before, but did not point to any specific slides or

statements.  Webster similarly threatened that if Crump did not sign documents regarding a

potential lawsuit he would be subject to criminal prosecution.

59.     On the same day, Guttenberg also threatened another employee involved with QI

with criminal prosecution unless he provided information about QI and signed documents

purporting to relinquish his vested equity in Augustus Intelligence.  When the employee refused

to make up false information and insisted on being represented by counsel, Augustus Intelligence

retaliated against him.  The company first took away his access to email and databases, and then

stripped him of the team that formerly reported to him.  The employee's former direct reports were

instructed not to communicate him and falsely told that QI had stolen their work.  Augustus Intelligence later put the employee on administrative leave, then terminated his employment. Augustus Intelligence made illegal deductions from the employee's final paycheck even after being informed by counsel for the employee (including citations to specific provisions of New York law) that they were prohibited.  Augustus Intelligence undertook these strong-arm tactics in lieu of a good faith, legitimate investigation into any concerns it may have had about QI.

60.    In the days following the December 10, 2019 meetings, Augustus Intelligence executives, including Haupt, made false and defamatory claims to employees, contractors, and third parties that Pacelli and Crump were "criminals," had stolen money, customers, and intellectual property, could not be trusted, and were "enemies."  Haupt and others knew that neither Pacelli nor Crump had stolen money or committed any crimes at the times these statements were made.

61.    During and following the December 10, 2019 meetings, Augustus Intelligence also made unjustified demands that Pacelli and Crump return their signing bonuses and stated definitively that it would not pay the second tranche of Crump's signing bonus when it came due.

62.    On December 18, 2019, Augustus Intelligence held an all hands meeting at which Haupt made additional defamatory statements about Crump and Pacelli. Every employee and consultant present in the office, even interns, was required to attend the meeting without regard to whether their job responsibilities had anything to do with Augustus Intelligence's disputes with Crump and Pacelli.  Haupt falsely represented to everyone present that Augustus Intelligence had conducted a months-long investigation involving inside and outside counsel, external investigators, and human resources consultants into QI.

63.    Haupt also falsely claimed that this investigation uncovered that Crump, Pacelli, and others had "lied to our faces" and stolen Augustus Intelligence's intellectual property. Haupt showed the QI presentation, which as noted above was an outdated draft that had never been shown to clients, to everyone present at the meeting in an attempt to incite them against Plaintiffs.

64.    Multiple of Plaintiffs' business contacts, some of whom know Augustus Intelligence only because Plaintiffs introduced them, have advised that Augustus Intelligence executives made false claims to them that Plaintiffs stole clients and intellectual property.

65.    When Crump requested that Augustus Intelligence pay him the $30,000 quarterly bonus it owed him under his employment agreement, Augustus Intelligence produced a doctored employment agreement that did not contain Crump's agreed-upon entitlement to a total of $120,000 in quarterly bonuses. Upon information and belief, Augustus Intelligence maintains "on the books" and "off the books" agreements to conceal from investors the true compensation of employees.

66.    On January 14, 2020, Augustus Intelligence filed a lawsuit against Pacelli and Crump in the Supreme Court of New York, New York County. The lawsuit alleged claims against Pacelli and Crump that arose from Pacelli's and Crump's former statuses as officers, employees, and agents of Augustus Intelligence. Plaintiffs removed that lawsuit to this Court.

67.    On January 17, 2020, Pacelli and Crump, by counsel, demanded that Augustus Intelligence indemnify them against its lawsuit and advance their defense costs incurred in the lawsuit pursuant to Augustus Intelligence's By-Laws.

68.    On January 20, 2020, Augustus Intelligence's counsel communicated to Pacelli's and Crump's counsel that Augustus Intelligence would not provide indemnification to Pacelli or Crump or advance their defense costs. The sole explanation provided for the refusal to provide

72233091.2

indemnification and advancement was that Pacelli and Crump were not officers of Augustus Intelligence, which is false.

69.    Other of Plaintiffs' contacts have learned about Augustus Intelligence's false and defamatory claims in Augustus Intelligence's lawsuit, apparently through Internet reports and other publicity about the lawsuit.

70.    On February 5, 2020, Augustus Intelligence voluntarily dismissed its lawsuit without obtaining any relief from Plaintiffs, whether through settlement or any judgment or order from this Court.

## Count I
## Fraudulent Inducement – Crump and Pacelli

71.    Crump and Pacelli incorporate by reference the averments of paragraphs 1-70 as if fully set forth herein.

72.    Augustus Intelligence, by its agents and employees acting within the scope of their agency or employment, including but not limited to Haupt and Weinberger, made false representations to Crump and Pacelli when Crump and Pacelli were in negotiations regarding their independent contractor and employment relationships with Augustus Intelligence.

73.    The false representations of fact included claims that: (1) Augustus Intelligence had raised over $80 million in funding, (2) Augustus Intelligence had a proprietary artificial intelligence product that would be functional at the outset of Pacelli's and Crump's employment, and (3) Augustus Intelligence had patented technology.

74.    Augustus Intelligence knew that each of these representations was false. Augustus Intelligence had not raised $80 million in funding because the investor allegedly contributing the bulk of that claimed funding has not invested any funds even to this day. Augustus Intelligence did not have a functioning, proprietary artificial intelligence product and instead had only demos

based on open source technology. Augustus Intelligence did not have any issued patents, but had only a single provisional patent application not yet finally approved by the United States Patent and Trademark Office. The nature of each of these objectively verifiable facts is such that Augustus Intelligence must have known them to be untrue.

75.    Augustus Intelligence intended that Crump and Pacelli would rely upon these misrepresentations to contribute their reputations and services to what appeared to be a promising venture. In fact, Augustus Intelligence was promoting Crump and Pacelli as key assets of the company in presentations to potential investors even before they joined as employees.

76.    Crump and Pacelli justifiably relied upon the misrepresentations. They had no access to the true financial information and were not provided with documents that would have disproved Augustus Intelligence's claims. They were rebuffed whenever they asked for documents about Augustus Intelligence's finances. Nor were they provided access to Augustus Intelligence's technology such that they could have discovered that it was based on open source, rather than proprietary, code.

77.    Crump and Pacelli relied to their detriment upon, and suffered damages from, Augustus Intelligence's misrepresentations because they agreed to execute employment agreements containing purported restrictive covenants that Augustus Intelligence now claims limit Pacelli's and Crump's ability to participate in ventures in the artificial intelligence industry. Had Crump and Pacelli not been induced to execute employment agreements with Augustus Intelligence, there would be no such restriction on their business activities.

78.    Crump and Pacelli suffered damages to their reputations as a result of their detrimental reliance on Augustus Intelligence's misrepresentations because Crump and Pacelli

72233091.2

introduced business contacts to an organization whose statements are permeated with fraud and misrepresentations.

WHEREFORE, Crump and Pacelli respectfully request that the Court:

A.      Order and declare that their assent to their respective July 13, 2019 and September 10, 2019 employment agreements and associated restrictive covenants was induced by fraud, and those agreements are rescinded and Crump and Pacelli are not bound by any restrictive covenants contained therein;

B.      Enter judgments in favor of each of Crump and Pacelli in the amount of $1,000,000, plus punitive damages in the amount of $1,000,000, plus prejudgment and postjudgment interest, plus the costs of this action; and

C.      Grant Crump and Pacelli such further relief as the Court may deem appropriate.

### Count II
### Indemnification and Advancement – Crump and Pacelli

79.      Crump and Pacelli incorporate by reference the averments of paragraphs 1-70 as if fully set forth herein.

80.      Augustus Intelligence filed its lawsuit against Crump and Pacelli in the Supreme Court of New York, New York County, on January 14, 2020.  Augustus Intelligence voluntarily dismissed its lawsuit on February 5, 2020 without obtaining any relief or finding of wrongdoing against Plaintiffs.

81.      Augustus Intelligence's lawsuit alleged claims against Crump and Pacelli based upon their actions and statuses as officers, employees, and agents of Augustus Intelligence, including claims that Crump and Pacelli breached their fiduciary duties to Augustus Intelligence.

82.      Augustus Intelligence's By-Laws at Section 6.1 provide that it is required to indemnify its officers against any expenses (including attorney's fees), judgments, fines,

- 21 -

72233091.2

settlements, and other amounts actually and reasonably incurred in connection with any proceeding arising by reason of the fact that such persons are or were agents of Augustus Intelligence. This indemnification obligation expressly extends to the maximum extent permitted by the Delaware General Corporate Law.

83.     Augustus Intelligence's By-Laws at Section 6.3 provide that it is required to advance its officers their defense costs for any action in which indemnification is required prior to the final disposition of the proceeding.

84.     Crump and Pacelli were officers of Augustus Intelligence.

85.     Crump and Pacelli are entitled to indemnification of any expenses, judgments, fines, settlements, and other amounts actually and reasonably incurred in connection with Augustus Intelligence's claims against them. Crump and Pacelli are also entitled to advancement of defense costs incurred in connection with Augustus Intelligence's claims against them.

86.     On January 17, 2020, Crump and Pacelli demanded that Augustus Intelligence honor its indemnification and advancement obligations. On January 20, 2020, Augustus Intelligence, through its counsel, communicated its refusal of that demand.

87.     Crump and Pacelli are entitled under Delaware law to recover their reasonable attorney's fees incurred in establishing and enforcing their indemnification and advancement rights because Augustus Intelligence's By-Laws do not expressly preclude the recovery of such fees.

WHEREFORE, Crump and Pacelli respectfully request that the Court:

A.     Order and declare that Crump and Pacelli are entitled to indemnification against any expenses (including attorney's fees), judgments, fines, settlements, and other amounts actually and reasonably incurred in connection with Augustus Intelligence's claims against them;

72233091 2

B.      Order and declare that Crump and Pacelli are entitled to the advancement of their defense costs incurred in connection with Augustus Intelligence's claims against them;

C.      Grant judgment in favor of Crump and Pacelli and against Augustus Intelligence in an amount equal to Crump's and Pacelli's defense costs incurred as of the date of judgment, plus the amount of reasonable attorney's fees incurred in establishing their right to indemnification and advancement, plus prejudgment and postjudgment interest, plus the costs of this action;

D.      Grant judgment in favor of Crump and Pacelli and against Augustus Intelligence in an amount equal to Crump's and Pacelli's expenses (including attorney's fees), judgments, fines, settlements, and other amounts actually and reasonably incurred in connection with Augustus Intelligence's claims against them, plus the amount of reasonable attorney's fees incurred in establishing their right to indemnification and advancement, plus prejudgment and postjudgment interest, plus the costs of this action; and

E.      Grant such further relief as the Court may deem appropriate.

## Count III
## Breach of Contract – Crump

88.     Crump incorporates by reference the averments of paragraphs 1-70 as if fully set forth herein.

89.     Crump's April 19, 2019 independent contractor agreement is a binding and enforceable agreement between the parties.

90.     Crump's independent contractor agreement provides for a ninety day engagement period.

91.     Crump's independent contractor agreement provides that "Stock Options will be awarded at the end of the 90 day period in the value of $100,000."

92.     Augustus Intelligence did not provide Crump with stock options in the value of $100,000 on July 22, 2019, the date ninety days after the start of Crump's independent contractor engagement.  To this date, Augustus Intelligence has never provided the stock options to Crump.

93.     Augustus Intelligence's failure to provide Crump with stock options in the value of $100,000 is a breach of the independent contractor agreement.

94.     Augustus Intelligence's failure to provide Crump with stock options in the value of $100,000 has caused damages to Crump.

WHEREFORE, Crump respectfully requests that the Court:

A.     Grant judgment in favor of Crump and against Augustus Intelligence in the amount of $100,000, plus prejudgment and postjudgment interest, plus the costs of this action; and

B.     Grant such further relief as the Court may deem appropriate.

## Count IV
## Violation of New York City Freelance Isn't Free Act – Crump

95.     Crump incorporates by reference the averments of paragraphs 1-70 and 89-94 as if fully set forth herein.

96.     In performing services pursuant to his April 19, 2019 independent contractor agreement with Augustus Intelligence, Crump was a "freelance worker" as defined in N.Y.C. Admin. Code §20-927, because he was a "natural person . . . hired or retained as an independent contractor by a hiring party to provide services in exchange for compensation."

97.     Part of Crump's "compensation" under his independent contractor agreement was an award of stock options in the value of $100,000.

98.     Augustus Intelligence did not provide Crump with stock options in the value of $100,000 by July 22, 2019, the date required under the independent contractor agreement, or at any time thereafter.

72233091.2

99.    Augustus Intelligence's failure to provide stock options in the value of $100,000 by the date set forth in the independent contractor agreement is a violation of N.Y.C. Admin. Code § 20-929(a).

100.    Under N.Y.C. Admin. Code § 20-933(b), Crump is entitled to recover the amount of unpaid compensation, plus double damages, plus his reasonable attorney's fees.

WHEREFORE, Crump respectfully requests that the Court:

A.    Grant judgment in favor of Crump and against Augustus Intelligence in the amount of $100,000, plus liquidated damages in the additional amount of $100,000, plus the amount of Crump's reasonable attorney's fees, plus prejudgment and post-judgment interest, plus the costs of this action; and

B.    Grant such further relief as the Court may deem appropriate.

### Count V
### Breach of Contract/Declaratory Relief – Crump

101.    Crump incorporates by reference the averments of paragraphs 1-70 as if fully set forth herein.

102.    To the extent it was not procured by fraud, Crump's September 10, 2019 employment agreement is a binding and enforceable agreement between the parties.

103.    Crump's September 10, 2019 employment agreement provides that:

You will be given a signing bonus in the amount of **one hundred eighty thousand dollars ($180,000.00)** which will be paid in two equal portions. The first portion will be paid at the Effective Date of this Agreement, and the second to follow after six (6) months following the Effective Date.

104.    Crump was paid the first $90,000 portion of his signing bonus. However, Augustus Intelligence has unjustifiably demanded that Crump return that $90,000.

105.    Augustus Intelligence has further stated, affirmatively and unequivocally, and shown by its conduct, that it will not pay the second $90,000 portion of Crump's signing bonus when it comes due in or about March 2020.

106.    The September 10, 2019 employment agreement contains no conditions precedent or subsequent to Crump's receipt or retention of the signing bonus, does not provide for forfeiture of any portion of the signing bonus, and does not require Crump to be employed for any particular period of time to receive or retain the signing bonus.

107.    The September 10, 2019 employment agreement also provides that Crump "will also be eligible for **quarterly bonuses of $30,000.00** based on your quarterly performance reviews."

108.    At the time of Crump's December 10, 2019 termination, he had performed services for Augustus Intelligence for three months, *i.e.*, a quarter, and therefore earned a $30,000 quarterly bonus.

109.    Augustus Intelligence did not pay Crump his $30,000 quarterly bonus.

110.    Under Crump's September 10, 2019 employment agreement, Augustus Intelligence was required to issue stock options to purchase 30,982 shares of Augustus Intelligence's stock. Augustus Intelligence never issued these options.

111.    Augustus Intelligence's (i) anticipatory repudiation of its obligation to pay the second $90,000 portion of Crump's signing bonus (ii) failure to issue options to purchase 30,982 shares of stock, and (iii) failure to pay Crump's $30,000 quarterly bonus are breaches of contract that have caused damages to Crump.

WHEREFORE, Crump respectfully requests that the Court:

72233091.2

A.    Order and declare that Crump is not obligated to return the $90,000 he received as the first portion of his signing bonus, or any part thereof, to Augustus Intelligence;

B.    Grant judgment in favor of Crump and against Augustus Intelligence in the amount of $90,000, plus prejudgment and postjudgment interest, plus the costs of this action; or

C.    In the alternative, order and declare that Crump is entitled to receive payment of the second portion of his signing bonus in the amount of $90,000 on March 16, 2020;

D.    Grant judgment in favor of Crump and against Augustus Intelligence in the amount of $30,000, plus prejudgment and postjudgment interest, plus the costs of this action;

E.    Order and declare that Augustus Intelligence's failure to issue stock options for Crump to purchase 30,982 shares of Augustus Intelligence's stock is a material breach of the September 10, 2019 employment agreement that precludes Augustus Intelligence from enforcing the restrictive covenants in that agreement; and

F.    Grant such further relief as the Court may deem appropriate.

### Count VI
### Violation of New York State Wage Payment Law – Crump

112.    Crump incorporates by reference the averments of paragraphs 1-70 and 107-109 as if fully set forth herein.

113.    In performing services for Augustus Intelligence pursuant to his September 10, 2019 employment agreement, Crump was an "employee" of Augustus Intelligence, and Augustus Intelligence was Crump's "employer," as defined in N.Y. Lab. Law § 190.

114.    Crump's $30,000 quarterly bonus was "wages" as defined in N.Y. Lab. Law § 190 because the bonus was a payment owed in an amount certain for Crump's performance of services as an employee of Augustus Intelligence.

- 27 -

115.    Augustus Intelligence failed to pay Crump's wages when it failed to pay his $30,000 quarterly bonus.

116.    Under N.Y. Lab. Law § 198, Crump is entitled to recover the amount of his unpaid wages, plus liquidated damages in the amount of 100% of the amount of unpaid wages, plus his reasonable attorney's fees.

WHEREFORE, Crump respectfully requests that the Court:

A.    Grant judgment in favor of Crump and against Augustus Intelligence in the amount of $30,000, plus liquidated damages in the additional amount of $30,000, plus the amount of Crump's reasonable attorney's fees, plus prejudgment and postjudgment interest, plus the costs of this action; and

B.    Grant such further relief as the Court may deem appropriate.

### Count VII
### Breach of Contract/Declaratory Relief/Accounting - Pacelli

117.    Pacelli incorporates by reference the averments of paragraphs 1-70 as if fully set forth herein.

118.    To the extent it was not procured by fraud, Pacelli's July 13, 2019 employment agreement is a binding and enforceable agreement between the parties.

119.    Under the July 13, 2019 employment agreement, Pacelli was entitled to receive "a one-time sign-on bonus of three hundred thousand dollars ($300,000.00)" in accordance with the terms of a Sign-On Agreement executed contemporaneously with the employment agreement.

120.    The Sign-On Bonus Agreement states that if Pacelli "departs the Company within twelve months following the Start Date without **'Good Reason**,' Employee shall repay to the Company, within ten (10) days following termination, all Sign-On Bonus amounts previously paid to Employee."

- 28 -

72233091.2

121.    Good Reason under the Sign-On Bonus Agreement shall "include" Pacelli's termination without Cause, Plaintiff's "substantial change in its business lines from those set forth in the business plan at the time of this Agreement," "a material diminishment in Employee's duties or responsibilities," or Plaintiff's liquidation or change in control.

122.    At the time of Pacelli's December 10, 2019 termination, at least three grounds of Good Reason existed.  First, Pacelli was terminated without cause by Augustus Intelligence. Second, as a result of Augustus Intelligence's November 6, 2019 pivot, Augustus Intelligence was engaged in the substantially different business line of providing professional consulting services rather than the development of its own proprietary artificial intelligence product.  Third, Pacelli's duties and responsibilities were materially diminished from those set forth in his employment agreement.  Pacelli was frozen out of the marketing and business development process.  Among other things, his recommendations for product development were summarily disregarded by other of Plaintiff's executives.  Augustus Intelligence never hired any member of the sales team that Pacelli was to lead.  Moreover, Augustus Intelligence had materially breached Pacelli's employment agreement by failing to award him the stock options promised in the agreement.

123.    Pacelli's July 13, 2019 employment agreement also provided that he was entitled to receive commissions in the amount of 5% or 7% of certain revenues received by Plaintiff.

124.    Pacelli introduced and developed customers on behalf of Augustus Intelligence including Conduent and Moblty/CVS.  Upon information and belief, Augustus Intelligence billed and has received revenue from these and other customers developed by Pacelli.

125.    Augustus Intelligence never accounted or provided information to Pacelli regarding any revenues it billed or received during his employment.

126.    To the extent Pacelli has not been paid commissions for amounts billed to customers Pacelli developed during his employment, Augustus Intelligence is in breach of the July 13, 2019 employment agreement.

127.    Under the July 13, 2019 employment agreement, Augustus Intelligence was required to issue Pacelli stock options to purchase 2.5% of Augustus Intelligence's outstanding stock.  Augustus Intelligence never issued these stock options to Pacelli.  The failure to issue stock options is a breach of the July 13, 2019 employment agreement.

WHEREFORE, Pacelli respectfully requests that the Court:

A.    Order and declare that Pacelli is not obligated to return the $300,000 he received as the first portion of his signing bonus, or any part thereof, to Augustus Intelligence;

B.    Order Plaintiff to account for any revenues from amounts billed by Augustus Intelligence to customers developed by Pacelli during his employment;

C.    Enter judgment in favor of Pacelli and against Augustus Intelligence in the amount of any commissions shown to be due to Pacelli from the accounting requested herein, plus prejudgment and postjudgment interest, plus the costs of this action;

D.    Order and declare that Augustus Intelligence's failure to issue stock options for Pacelli to purchase 2.5% of Augustus Intelligence's stock is a material breach of the July 13, 2019 employment agreement that precludes Augustus Intelligence from enforcing the restrictive covenants in that agreement; and

E.    Grant such further relief as the Court may deem appropriate.

### Count VIII
### Defamation/Slander – Crump and Pacelli

128.    Crump and Pacelli incorporate by reference the averments of paragraphs 1-70 as if fully set forth herein.

129.    On December 10, 2019 and thereafter, Augustus Intelligence's agents and employees, including but not limited to Haupt and Guttenberg, made false and defamatory statements regarding Crump and Pacelli, including that they were "criminals," had stolen money, could not be trusted, and were "enemies." These statements were made by Haupt, Guttenberg, and others in the course of their employment by Augustus Intelligence.

130.    These defamatory statements were published to other of Augustus Intelligence's employees as well as other third parties who were not employed by Augustus Intelligence.

131.    These defamatory statements were made with malice because Haupt, Guttenberg, and the other persons making the statements did not have a good faith belief that Crump or Pacelli had actually stolen money, customers, or intellectual property from Augustus Intelligence or committed any crime.  Indeed, this lack of belief is shown by the fact that Plaintiff filed a lawsuit against Crump and Pacelli that does not allege any theft of money or criminal behavior and does not identify any specific intellectual property or customers misappropriated.  Haupt, Guttenberg, and others knew these statements were false when they made them or were at least reckless as to their truth or falsity due, among other things, to Augustus Intelligence's failure to undertake any good faith investigation of QI.

132.    These defamatory statements alleging that Crump and Pacelli committed criminal acts constitute defamation *per se* and no special damages are required to be shown.  To the extent special damages are required, these statements made in the context of the relatively small artificial intelligence start-up community have, upon information and belief, caused actual damage to Crump's and Pacelli's reputations by spreading false rumors about their conduct.

WHEREFORE, Crump and Pacelli respectfully request that the Court:

A.      Enter judgments in favor of each of Crump and Pacelli, and against Augustus Intelligence, in the amount of $1,000,000, plus punitive damages in the amount of $1,000,000, plus prejudgment and post-judgment interest, plus the costs of this action; and

B.      Grant such further relief as the Court may deem appropriate.

## Count IX
### Malicious Prosecution

133.      Crump and Pacelli incorporate by reference the averments of paragraphs 1-70 as if fully set forth herein.

134.      Augustus Intelligence filed suit against Plaintiffs in the Supreme Court of New York, New York County on January 14, 2020.

135.      Augustus Intelligence's lawsuit terminated in favor of Plaintiffs when Augustus Intelligence voluntarily dismissed its claims on February 5, 2020.

136.      Augustus Intelligence lacked probable cause to institute its lawsuit.  Augustus Intelligence's Complaint did not identify a single item of intellectual property or single customer that Plaintiffs allegedly misappropriated, because Plaintiffs did not misappropriate any intellectual property or customers.

137.      Augustus Intelligence's filing of the lawsuit was motivated by actual malice, hatred, and a desire to cause unjustified injury to Plaintiffs by smearing their reputations in a public court filing.

138.      Plaintiffs have suffered special damages in the form of reputational damage as a result of Augustus Intelligence's actions.  Numerous business contacts and investors have commented on the pendency of the lawsuit and cited it as a reason why they could not do business with Plaintiffs.  One investor, while expressing that he did not believe Augustus Intelligence's

allegations, stated that the lawsuit's pendency would be a "ten year stain" on Plaintiffs' reputations and ability to do business.

WHEREFORE, Crump and Pacelli respectfully request that the Court:

A.    Enter judgments in favor of each of Crump and Pacelli, and against Augustus Intelligence, in the amount of $1,000,000, plus punitive damages in the amount of $1,000,000, plus prejudgment and post-judgment interest, plus the costs of this action; and

B.    Grant such further relief as the Court may deem appropriate

Respectfully submitted,

Gabriel Levinson, Esq., #3059243
Darnell S. Stanislaus, Esq., #4956330
POLSINELLI PC
600 Third Avenue, 42nd Floor
New York, New York 10016
Telephone: (212) 684-0199
Facsimile: (212) 684-0197
glevinson@polsinelli.com
dstanislaus@polsinelli.com

Connie N. Bertram, Esq.*
POLSINELLI PC
1401 I Street, NW, Suite 800
Washington, D.C. 20005
Telephone: (202) 783-3300
Facsimile: (202) 783-3535
cbertram@polsinelli.com

* *Pro hac vice* application forthcoming

*Counsel for Plaintiffs Marco Pacelli
and Ed Crump*

Dated: February 5, 2020

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served on February 5, 2020 by electronic mail and first-class mail to the following:

Lewis Bartell
Law Office of Lewis A. Bartell
100 Quentin Roosevelt Boulevard
Suite 102
Garden City, New York 11530
lb@lewisbartell.com

Darnell S. Stanislaus, Esq.

72233091.2