UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                      :

MARCO PACELLI and ED CRUMP,         :

                      :

         Plaintiffs,         :

                      :         20-cv-1011 (LJL)

     -v-               :

                      :     OPINION AND ORDER

AUGUSTUS INTELLIGENCE, INC.,      :

                      :

         Defendant.      :

                      :

------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___5/11/2020___

LEWIS J. LIMAN, United States District Judge:

      This is a fraudulent inducement and breach-of-contract case.  Defendant Augustus

Intelligence, Inc. ("Augustus") moves to compel Plaintiffs Marco Pacelli and Ed Crump

("Plaintiffs") to arbitration and to stay the litigation.  For the following reasons, the motion is

granted.

## BACKGROUND

### 1.  Factual Background

      Augustus is a technology company specializing in artificial intelligence.  (Dkt. No.

24 ¶ 1; Dkt. No. 5–7 at 2.)  Its principal place of business is New York.  (Dkt. No. 24 ¶ 8.)

Plaintiffs are former employees of Augustus.  Marco Pacelli is a Florida citizen and Ed Crump is

a California citizen.  (*Id.* ¶¶ 6–7.)

      Pacelli alleges that he was fraudulently induced to sign both an independent contractor

agreement and later an employment agreement with Augustus.  According to the Amended

Complaint (Dkt. No. 24 (hereinafter, the "Complaint")), Pacelli learned about Augustus in

December 2018.  (*Id.* ¶ 20.)  In January 2019, Pacelli met with the Augustus co-founders who

"pitched him on the company's supposedly rich funding and cutting edge technology." (*Id.*) In February 2019, Pacelli accepted an independent contractor position with Augustus. (*Id.* ¶¶ 20–22.) Pacelli allegedly planned to terminate his relationship with Augustus at the end of the contractor period, but the Augustus co-founders changed his mind with "glowing representations about Augustus Intelligence's funding and the status of its technology." (*Id.* ¶ 27.) He signed an employment agreement on July 13, 2019 that elevated him to the position of Chief Commercial Officer. (*Id.* ¶ 28; Dkt. No. 5–2 (the "Pacelli Agreement").)

The Pacelli Agreement promised a signing bonus, sales commissions, and stock options. (Dkt. No. 24 ¶¶ 29–31; Dkt. No. 5–2.) It "anticipate[d] that [Pacelli would] initially work from home and ultimately from the Florida office to be established" but stated that Pacelli would "need, especially at the beginning of [the] engagement, to report regularly to the office in New York, NY." (Dkt. No. 5–2 at 3.) Additionally, the Pacelli Agreement prohibited Pacelli from being "directly or indirectly engaged or interested in any capacity in any other business, trade or occupation whatsoever so long as [he was] employed" by Augustus (without Augustus's prior written consent). (*Id.* at 4.) Finally, the Pacelli Agreement contained an arbitration provision, which will be discussed in further detail below. (*Id.*, Exhibit C.)

Ed Crump also complains that he was fraudulently induced to work for Augustus. He first met with the executive team at Augustus in the spring of 2019. (Dkt. No. 24 ¶ 24.) According to the Complaint, the team made various representations to him too about the status of the technology and the company's funding. (*Id.* ¶¶ 24, 175.) Like Pacelli, Crump started at Augustus as an independent contractor. (*Id.* ¶¶ 25–26.) According to the Complaint, Augustus promised Crump that he would receive stock options at the end of the contractor period. (*Id.* ¶ 25.)

On September 10, 2019, Crump signed an employment agreement.  (*Id.* ¶ 39; Dkt. No. 5–3 ("Crump Agreement").)  His title was Head of Product.  (*Id.*)  Like the Pacelli Agreement, the Crump Agreement contained various promises and obligations.  Crump was promised stock options and a signing bonus.  (Dkt. No. 5–3.)  He was prohibited (without Augustus's prior written consent) from being "directly or indirectly engaged or interested in any capacity in any other business, trade or occupation whatsoever so long as [he was] employed by" Augustus. (*Id.*)  But the Crump Agreement differed from the Pacelli Agreement in certain respects.  For example, the Crump Agreement stated that Augustus "agree[d] and acknowledge[d]" that Crump would "from time to time, engage as an Advisor for other companies so long as th[o]se engagements [did] not compete or present a conflict of interest to Augustus."  (*Id.*)  The Crump Agreement also stated that Crump's "primary office" would "be the Company's offices in New York, NY."  (*Id.*)  Like the Pacelli Agreement, however, the Crump Agreement contained an arbitration provision.  (Dkt. No. 5–3, Exhibit C.)  Indeed, the provisions are almost identical. (*Compare* Dkt. No. 5–2, Exhibit C; Dkt. No. 5–3, Exhibit C (both referenced hereinafter as the "Arbitration Provision").[1]

An important event happened between Pacelli's execution of the Pacelli Agreement (on July 13, 2019) and Crump's execution of the Crump Agreement (on September 20, 2019).  On

---

[1] The only difference between the arbitration provisions in the two agreements relates to the length of the mediation that the parties must endeavor to engage in prior to commencing arbitration.  The Crump Agreement provides that "[i]f a dispute arises from or relates to this contract or the breach thereof, and if the dispute cannot be settled through direct discussions, the parties agree to endeavor first to settle the dispute by mediation administered by the American Arbitration Association under its Employment Mediation Procedures before resorting to arbitration f*or a period of sixty (60) days*, commencing from the date any such dispute is brought to the American Arbitration Association" and that "[i]f the parties fail to reach resolution of the dispute *within such sixty (60) day mediation period*, the parties agree" to arbitrate "any unresolved controversy or claim."  (Dkt. No. 5–3, Exhibit C (emphasis added).)  The Pacelli Agreement provides the same regarding mediation and arbitration, except that it lacks the language specifying that the mediation endeavor will last "for a period of sixty (60) days."  (Dkt. No. 5–2, Exhibit C.)  Rather, under the Pacelli Agreement, the time length of the mediation endeavor is unspecified.  (*Id.*) This distinction is ultimately immaterial to the resolution of this case.  *Cf.* Dkt. No. 5–4 (Plaintiffs' counsel's representation that the language is "the same in all material respects").  For convenience, the Court will quote the language from the Pacelli Agreement when referencing the Arbitration Provision.

July 17, 2019, Pacelli and Crump incorporated an LLC called Quantum Intelligence ("QI") along with two other individuals.  (Dkt. No. 24 ¶ 32.)  The Complaint insists that "QI was not competitive with Augustus Intelligence"; while Augustus was "develop[ing] proprietary artificial intelligence product[s] to sell to customers," QI was "providing financial, operational, technical and data monetization advice to start-ups."  (*Id.* ¶ 37.)  On July 19, 2019 (six days after Pacelli signed the Pacelli Agreement), one of the individuals who co-founded QI—but not Pacelli or Crump—met with Augustus executives, proposed that Augustus could undertake QI's business model under a different name, and "disclosed that QI had been formed[.]"  (*Id.* ¶ 38.)  Augustus passed on the business opportunity.  (*Id.*)  According to the Complaint, Pacelli and Crump both disclosed their QI involvement to Augustus—Crump in September 2019 and Pacelli in November 2019—and Augustus executives did not object.  (*Id.* ¶¶ 42, 54, 57.)

As Plaintiffs tell this story, their employment relationships with Augustus were fraught from the start.  Soon after they began working as full-time Augustus employees, they discovered that many of the representations that had been made to them were untrue.  (*Id.* ¶ 43.)  "In fact," the Complaint summarizes, "the company did not have [its stated] funding, did not have a product, and did not have substantial customers or revenues."  (*Id.* ¶ 46.)

Crump and Pacelli assert that, throughout the fall of 2019, Augustus decided to "freeze [them] out" and "marginaliz[e]" them.  (*Id.* ¶¶ 49, 53.)  The motivation, Plaintiffs contend, was financial.  As the end of the year approached, Augustus's debts loomed—including several substantial bonus and commission payments to Plaintiffs.  (*Id.* ¶ 56–57.)  Augustus's revenue stream stalled.  (*Id.* ¶ 55.)  Ultimately, according to the Complaint, Augustus concocted "baseless allegations about QI" as a pretext for terminating Pacelli and Crump, thereby avoiding the obligation to make bonus and commission payments.  (*Id.* ¶ 57.)

4

On December 10, 2019, Augustus executives informed Pacelli and Crump that Augustus was terminating them for cause, based on their involvements with QI.  (*Id.* ¶ 59.)  According to the Complaint, over the following days, Augustus executives made various defamatory statements about Plaintiffs to employees, contractors, and third parties.  (*Id.* ¶ 62.)  Those statements included that Pacelli and Crump "were 'criminals,' had stolen money, customers, and intellectual property, could not be trusted, . . . were 'enemies,'" and had "lied."  (*Id.* ¶¶ 62, 65.) Augustus also allegedly insisted that Plaintiffs return their signing bonuses.  (*Id.* ¶ 63.)  When Crump demanded that Augustus pay him part of his due bonus, Augustus allegedly "produced a doctored employment agreement to Crump's counsel."  (*Id.* ¶ 67.)

## 2. Procedural Background

On January 14, 2020, Augustus filed a lawsuit against Pacelli and Crump in the Supreme Court of New York, New York County.  (Dkt. No. 11–1.)  Augustus's complaint alleged breaches of the Crump and Pacelli Agreements, breaches of the duty of loyalty, misappropriation of proprietary information, and related claims.  (*Id.*)  Pacelli and Crump removed that lawsuit to federal court.  (Dkt. No. 24 ¶ 68.)  The next day, counsel for Pacelli and Crump sent counsel for Augustus a three-page letter "request[ing]" that Augustus "dismiss [the] pending lawsuit in favor of an arbitration proceeding, as required by the binding arbitration provisions in Mr. Crump and Mr. Pacelli's employment agreements."  (Dkt. No. 5–4.)  The letter characterized the Arbitration Provision as "the paradigm of a broad [arbitration] clause" and insisted that it "encompasse[d] not only claims for breach of the employment agreements, but also any claims that 'touch[ed] upon matters covered by the agreement.'"  (*Id.* (quoting *Collins v. Aikman Products Co. v. Building Systems, Inc.*, 58 F.3d 16, 20 (2d Cir. 1995); *Mehler v. Terminix Intl. Co. L.P.*, 205 F.3d 44, 50 (2d. Cir. 2000)); *see id.* (further characterizing the Arbitration Provision as "indisputably

broad")). "Each claim in [Augustus's] Complaint is within the scope of these arbitration agreements," the letter stated. (*Id.*) The letter then summarized all eighteen of Augustus's claims and explained why each one should be compelled to arbitration. (*Id.*) In closing, the letter asserted:

> Pursuant to Rule 11(c)(2), we request that [Augustus] withdraw its Complaint within the next 21 days. Should [Augustus] fail to do so, Messrs. Crump and Pacelli reserve the right to seek sanctions, including all attorneys' fees incurred in filing and prosecuting a motion to compel arbitration.

(*Id.*) In compliance with that directive, Augustus filed a notice of voluntary dismissal without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i) on February 5, 2020 (the twenty-first day after the letter was sent). (Dkt. No. 5–5; Dkt. No. 11 ¶ 12.)[2] Simultaneously, Augustus filed a "Demand for Arbitration" with the American Arbitration Association. (Dkt. No. 5–7 at 6; Dkt. No. 11–4 at 2.)

On the same day, in a startling reversal of their position that the matters presented above were "required" to be arbitrated, Plaintiffs filed their first complaint in the instant lawsuit. (Dkt. No. 1.) According to Plaintiffs, that filing "enraged Augustus Intelligence's executive team." (Dkt. No. 24 ¶ 74.) The Complaint asserts that Augustus, in response to the lawsuit, retained two investigative teams to advise the company on the lawsuit. (*Id.* ¶¶ 75, 77.) The investigative teams allegedly conducted illegal surveillance of Pacelli. (*Id.* ¶¶ 82–86.) Specifically, Pacelli noticed that a "red van remained parked in the same location outside [his] apartment for nearly a week or more" and discovered that an unknown individual had attempted to gain access to Pacelli's apartment by pretending to be a painting contractor. (*Id.* ¶¶ 79, 81.)

The Complaint proceeds in twelve counts. (*Id.* ¶¶ 87–184.) Those are:

---

[2] Before Augustus dismissed the case—indeed, the day after Plaintiffs' counsel sent the arbitration demand—Plaintiffs' counsel demanded that Augustus indemnify Pacelli and Crump against the lawsuit and advance defense costs. (Dkt. No. 24 ¶ 69.) Augustus's counsel refused. (*Id.* ¶ 70.)

1. Fraudulent inducement (by Augustus during negotiations regarding independent contractor and employment relationships)
2. Indemnification and advancement (based on Augustus's obligation under its by-laws to indemnify and advance defense costs to those who are officers)
3. Breach of Crump's independent contractor agreement
4. Violation of the New York City Freelance Isn't Free Act (based on Augustus's failure to provide due compensation to Crump as an independent contractor)
5. Breach of the Crump Agreement
6. Violation of the New York State Wage Payment Law (based on Augustus's failure to pay Crump due wages as an employee)
7. Breach of the Pacelli Agreement
8. Defamation and slander (based on Augustus employee statements about Pacelli and Crump)
9. Malicious prosecution (based on Augustus's lack of probable cause to initiate its January 14, 2020 lawsuit)
10. Violation of 18 U.S.C. § 2511 (based on Augustus's surveillance of Pacelli and Crump)
11. Private nuisance (based on Augustus's electronic surveillance of Pacelli)
12. Violation of the Racketeer Influenced and Corrupt Organization Act (based on an Augustus scheme to defraud and extort Pacelli and Crump)[3]

(*Id.*)  On February 10, 2020, Augustus filed a motion to compel arbitration and stay the litigation. (Dkt. No. 5.)  Plaintiffs responded (Dkt. No. 8) and Augustus replied.  (Dkt. No. 12.)[4]

Plaintiffs' opposition urged that, by bringing an action in state court, Augustus had waived its right to arbitrate.  (Dkt. No. 8 at 9–15.)  Plaintiffs also argued that the Arbitration Provision fails to provide due process or fundamentally fair procedures (*id.* at 16–18), that some of Plaintiffs' claims fall outside the Arbitration Provision (as not arising under or related to the Crump and Pacelli Agreements) (*id.* at 20–21), and that, under California law, Crump cannot be compelled to arbitrate in New York  (*id.* at 18–20).

In late February 2020, the Court scheduled an evidentiary hearing on a factual matter related to one of the arguments against arbitration.  (Dkt. No. 17.)  That hearing was postponed

---

[3] Of note, Counts 10–12 and the facts alleged in their support were added in the amended complaint.  (*See* Dkt. No. 2.)
[4] On February 28, 2020, Plaintiffs moved for summary judgment on their claims for indemnification and advancement.  (Dkt. No. 19.)  Shortly after, the Court ordered that Augustus's deadline to respond to that motion was adjourned pending further order from the Court.  (Dkt. No. 25.)

for reasons related to the COVID-19 crisis.  (Dkt. No. 34.)

On March 13, 2020, Augustus (represented by new counsel) submitted a letter arguing that the previously-referenced factual matter need not be decided in order to resolve the arbitration issue.  (Dkt. No. 37.)  The Court invited further briefing on that question and two additional questions related to arbitrability.  (Dkt. No. 36.)  Both parties timely submitted papers. (Dkt. Nos. 37–40.)

## APPLICABLE LAW

Under the Federal Arbitration Act ("FAA"), any "party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" may seek "an order directing that such arbitration proceed in the manner provided for in the agreement."  9 U.S.C. § 4.  A court's decision to compel arbitration is governed by Section 2 of the FAA.  That section provides that a "written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The Supreme Court has described Section 2 as "reflecting both a 'liberal federal policy favoring arbitration,' and the 'fundamental principle that arbitration is a matter of contract.'"  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010)).

At least three questions, like layers in a *matryoshka* doll, might arise in an arbitration dispute.  Starting at the interior and moving outwards, those are: "1) the merits of the dispute; 2) whether the dispute is to be arbitrated—the so called 'question of arbitrability'; and 3) whether a court or an arbitrator is to decide the question of arbitrability."  *VRG Linhas Aereas S.A. v.*

8

*MatlinPatterson Glob. Opportunities Partners II L.P.,* 717 F.3d 322, 325 (2d Cir. 2013) (citing

*First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938 (1995)); *id.* at 326 ("Question Three asks

who will answer Question Two (the question of arbitrability), and Question Two in turn asks

who will answer Question One (the decision on the merits).").  With respect to the second

inquiry, the Second Circuit has held that the phrase "'[q]uestions of arbitrability' is a term of art"

that covers disputes about "whether the parties are bound by a given arbitration clause as well as

disagreement[s] about whether an arbitration clause in a concededly binding contract applies to a

particular type of controversy." *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 393 (2d

Cir. 2011) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (internal

quotation marks omitted)).  Parties may delegate questions of arbitrability to the arbitrator "so

long as the parties' agreement does so by 'clear and unmistakable' evidence." *Henry Schein,*

*Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) (quoting *First Options*, 514 U.S. at

944).  Still, "[t]o be sure, before referring a dispute to an arbitrator, the court determines whether

a valid arbitration agreement exists." *Id.* (citing 9 U.S.C. § 2).

"In the context of motions to compel arbitration brought under the Federal Arbitration

Act . . . , the court applies a standard similar to that applicable for a motion for summary

judgment. If there is an issue of fact as to the making of the agreement for arbitration, then a trial

is necessary." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) (citations omitted).

## DISCUSSION

### 1.  Whether a Valid Arbitration Agreement Exists

At the outset, the Court must assess the "very existence of the contract embodying the

arbitration clause." *Republic of Ecuador*, 638 F.3d at 392 (quoting *Specht v. Netscape*

*Commc'ns Corp.*, 306 F.3d 17, 26 (2d Cir. 2002)).  Unlike the "enforceability or applicability" of

an arbitration agreement, which may be delegated to an arbitrator, questions regarding the

"formation of the parties' arbitration agreement" must be decided by a court.  *Doctor's Assocs.,*

*Inc. v. Alemayehu*, 934 F.3d 245, 251 (2d Cir. 2019) (quoting *Granite Rock Co. v. International*

*Brotherhood of Teamsters*, 561 U.S. 287, 299 (2010) (internal quotation marks omitted); *id.*

("Arguments that an agreement to arbitrate was never formed . . . are to be heard by the court

even where a delegation clause exists.") (quoting *Edwards v. Doordash, Inc*., 888 F.3d 738, 744

(5th Cir. 2018)); *Hines v. Overstock.com, Inc*., 380 F. App'x 22, 24 (2d Cir. 2010) (moving party

need not "show initially that the agreement would be *enforceable*, merely that one existed").

That is because "[a]n agreement that has not been properly formed is not merely an

unenforceable contract; it is not a contract at all."  *Alemayehu*, 934 F.3d at 251.  "And if it is not

a contract, it cannot serve as the basis for compelling arbitration."  *Id.*; 9 U.S.C. § 2 ("A written

provision in . . . *a contract* evidencing a transaction involving commerce to settle by arbitration a

controversy thereafter arising out of *such contract* . . . shall be valid, irrevocable, and

enforceable, save upon such grounds as exist at law or in equity for the revocation of any

contract.") (emphasis added).

  In this case, there is—and can be—no dispute that the parties signed a valid arbitration

agreement.  Plaintiffs admit that they executed their employment agreements and that those

agreements included the Arbitration Provision.  (*See* Dkt. No. 5–2, Exhibit C; Dkt. No. 5–3,

Exhibit C.)  Indeed, Plaintiffs argue that "[t]he arbitration agreements at issue provide for

arbitration to proceed on a confidential basis," which presupposes that the arbitration agreements

exist.  (Dkt. No. 8 at 13.)  Not to mention the fact that Plaintiffs themselves demanded

arbitration, pursuant to the Arbitration Provision, while this dispute was in state court.  (Dkt. No.

5–4.)

Having concluded that a valid arbitration agreement existed, the Court turns to its

enforceability and scope—and, before that, to the question of who should decide those questions.

2.  **Delegation of Arbitrability**

    a.  **Arbitration Provision and Whether Mediation Requirement Precludes Delegation of Arbitrability**

In relevant part, the Arbitration Provision states:

> If a dispute arises from or relates to this contract or the breach thereof, and if the dispute cannot be settled through direct discussions, the parties agree to endeavor first to settle the dispute by mediation administered by the American Arbitration Association under its Employment Mediation Procedures before resorting to arbitration. The parties further agree that any unresolved controversy or claim arising out of or relating to this contract, or breach thereof, shall be settled by arbitration administered by the American Arbitration Association in accordance with its Employment Arbitration Rules and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

> Claims shall be heard by a single arbitrator. The arbitrator(s) shall be an expert in employment matters. The place of arbitration shall be the City, County and State of New York. The arbitration will be based on the submission of documents and there shall be no in-person or oral hearing. The award shall be made within three months of the filing of the notice of intention to arbitrate (demand), and the arbitrator(s) shall agree to comply with this schedule before accepting appointment. However, this time limit may be extended by the arbitrator for good cause shown, or by mutual agreement of the parties. Any award in an arbitration initiated under this clause shall be limited to monetary damages and shall include no injunction or direction to any party other than the direction to pay a monetary amount. The prevailing party shall be entitled to an award of reasonable attorney fees. Except as may be required by law, or as may be required in an action to enforce, modify, or vacate the award, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties.

> THIS MEANS THAT, TO THE FULLEST EXTENT PERMITTED BY LAW, THE PARTIES HEREBY KNOWINGLY WAIVE THEIR RIGHTS TO A JURY OR COURT TRIAL OF DISPUTES WHICH ARE REQUIRED TO BE ARBITRATED BY THIS AGREEMENT.

> While this agreement to arbitrated is intended to be broad (and covers, e.g., claims under the state and federal laws prohibiting discrimination on the basis of race, sex, age, disability, etc., to the fullest extent permitted by law), it may

> not be applicable to your rights under the applicable workers' compensation
> law, which may be governed under the special provisions of that law.

(Dkt. No. 5–2, Exhibit C.)

The first paragraph of the Arbitration Provision articulates a category of disputes and then sets forth two methods of dispute resolution that the parties will "endeavor" to use before taking those disputes to arbitration. The category of disputes is "dispute[s] aris[ing] from or relate[d] to this contract or the breach thereof." (*Id.*) The first sentence of the Arbitration Provision directs the parties to attempt to address those disputes via "direct discussions." (*Id.*) If a dispute can be settled through direct discussions, it will presumably end. But "if the dispute *cannot* be settled through direct discussions," the parties will "endeavor first to settle the dispute by mediation[.]" (*Id.*) If the dispute is resolved by mediation, it will presumably end. But "any *unresolved* controversy or claim . . . shall be settled by arbitration administered by the American Arbitration Association in accordance with its Employment Arbitration Rules." (*Id.*)

The second paragraph describes the type of arbitration procedures that will govern the dispute. The third and fourth paragraphs emphasize the breadth of the Arbitration Provision— that it applies "to the fullest extent permitted by law" and that it "is intended to be broad." (*Id.*) There are no carve-outs for non-arbitrable disputes within the previously-mentioned category of "dispute[s] aris[ing] from or relate[d] to this contract or the breach thereof."[5] (*Id.*; *compare Schein*, 139 S. Ct. at 528 (arbitration provision at issue required arbitration of "[a]ny dispute arising under or related to this Agreement (*except for* actions seeking injunctive relief and disputes related to trademarks, trade secrets, or other intellectual property of [Schein])" (emphasis added)).)

---

[5] The fourth paragraph warns that the Arbitration Provision "may not be applicable" to claims arising "under the applicable workers' compensation law" because those "may be governed under the special provisions of *that law*." (Dkt. No. 5–2, Exhibit C.) It does not suggest any limitation imposed by the Arbitration Provision itself.

As noted above, the Arbitration Provision requires arbitration to be "administered by the American Arbitration Association in accordance with its Employment Arbitration Rules."  (Dkt. No. 5–2, Exhibit C.)  Under Rule 6(a) of the AAA's Employment Arbitration Rules (the "AAA Rules"), "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." AAA Employment Arbitration Rules & Mediation Procedures, *available at* https://www.adr.org/sites/default/files/EmploymentRules_Web_2.pdf.

When "parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator."  *Contec Corp. v. Remote Sol., Co*., 398 F.3d 205, 208 (2d Cir. 2005); *see Alderson v. DeVere USA, Inc*., 2018 WL 3756451, at *2 (S.D.N.Y. July 24, 2018) (citing *Contec* in holding that a contract's incorporation of Rule 6(a) of the AAA's Employment Arbitration Rules "serve[d] as 'clear and unmistakable evidence of the parties' intent' to delegate arbitrability issues to the arbitrator").  Therefore, the part of the Arbitration Provision requiring claims to be "settled by arbitration administered by the American Arbitration Association in accordance with its Employment Arbitration Rules" is—standing alone— "clear and unmistakable evidence" of intent to delegate.  (Dkt. No. 5–2, Exhibit C.)

At issue, however, is whether the preceding mediation requirement means that there is no such "clear and unmistakable evidence" of the parties' intent to delegate.  Plaintiffs argue that the Arbitration Provision does not "clearly and unmistakably" delegate to arbitrators the authority to determine their own jurisdiction because the "mediation/arbitration framework is only workable if the Court retains jurisdiction to determine which claims are subject to the provision."  (Dkt. No. 38 at 2.)  Specifically, according to Plaintiffs, because the only claims that

are subject to arbitration are claims that were not "resolved" in the mediation, and because

AAA's Employment Mediation Procedures do not give the *mediator* authority to rule on her own

jurisdiction, questions of arbitrability are not clearly and unmistakably delegated to the

arbitrator: "[T]he arbitration provisions can only be read as retaining Courts to decide in the first

instance whether a particular dispute is subject to mediation and arbitration (since only a subset

of 'unresolved' issues from the mediation can be submitted for arbitration)."  (*Id.*)

> That argument is meritless.  Although Plaintiffs state—without elaboration—that "only a

subset of 'unresolved' issues from the mediation can be submitted to arbitration," the scope of

the arbitration requirement is "conterminous" with the scope of the mediation requirement as

Plaintiffs later admit.  (*Id.* at 2–3; *see id.* at 3 ("[T]he parties only agreed to arbitrate disputes that

were first mediated—and vice-versa.")).  Under the Arbitration Provision, "[i]f a dispute *arises

from or relates to this contract or the breach thereof* . . . the dispute" goes to mediation.  (Dkt.

No. 5–2, Exhibit C (emphasis added).)  From there, "any unresolved controversy or claim *arising

out of or relating to this contract, or breach thereof*" proceeds to arbitration.  (*Id.* (emphasis

added).)  The mediation/arbitration framework is thus entirely workable without recourse to the

Court to determine the question of mediation.  If an arbitrator determines that a dispute "arises

from or relates to th[e] contract or the breach thereof," she will necessarily have also determined

that the parties were required to "endeavor" to mediate the dispute.  (*Id.*)  And, if the dispute

does not fall within the scope of the arbitration requirement then it also would not fall within the

scope of the mediation requirement.  There is no space between the two.

> The plain structure of the provision is to funnel the parties gradually from less costly to

more costly dispute resolution mechanisms—from "direct discussions" to mediation to

arbitration.  (*Id.*)  That makes sense.  Parties hope to resolve disputes efficiently.  Under

Plaintiffs' view, however, before a dispute could be resolved through arbitration, the parties would have to mediate it, then go to the court to litigate the arbitrability of any unresolved dispute, and only afterwards proceed to arbitration.  *That* framework is unworkable.  Of course, it is not always clear whether a dispute arises from a contract breach or falls within the scope of an arbitration provision.  But that is the point of a broad arbitration provision accompanied by a delegation to the arbitrator.  It permits a single decisionmaker to make efficient decisions both as to arbitrability and as to the merits of the dispute.  Nothing in the language or logic of the contract supports the sequence proposed by Plaintiffs.

Indeed, Plaintiffs themselves characterize the mediation requirement as merely "a condition precedent to arbitration" that "has no legal effect on the issues before the Court."  (Dkt. No. 38 at 3.)  The Court agrees, and notes that mediation as a "condition precedent" underscores the delegation to an arbitrator of the question of arbitrability.  Under New York law, "[a] condition precedent is 'an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises.'"  *Utica Mut. Ins. Co. v. Clearwater Ins. Co*., 906 F.3d 12, 22 (2d Cir. 2018) (quoting *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co*., 660 N.E.2d 415, 418 (1995)).[6]  The Arbitration Provision states that the parties will "endeavor first to settle the dispute by mediation" and that "any unresolved controversy or claim" will be "settled by administration."  Mediation, therefore, is "an act or event" that "must occur before" the "duty to [arbitrate] arises."  *Utica*, 906 F.3d at 22.  The word "unresolved" only clarifies the procedural sequence; it does not circumscribe the universe of substantive claims to be arbitrated.  (After all, if a dispute is *resolved* after mediation,

---

[6] When assessing whether a contract delegates questions of arbitrability to an arbitrator, courts must look at the contract "as construed by relevant state law." *Bechtel do Brasil Construcoes Ltda. v. UEG Araucaria Ltda*., 638 F.3d 150, 155 (2d Cir. 2011).  The Crump Agreement and Pacelli Agreement both specify that they "will be governed by the laws of the State of New York."  (Dkt. No. 5–2 at 5; Dkt. No. 5–3 at 3; *cf*. Dkt. No. 8 at 9 (Plaintiffs' briefing applying New York law)).

it is simply no longer a dispute.)  An "unresolved" dispute is a procedural, rather than substantive, description.  *See also supra* (noting that the types of disputes designated for mediation and arbitration are coterminous).[7]

Plaintiffs further argue that the *existence* of that condition precedent precludes a determination that the parties "clearly and unmistakably" delegated arbitrability questions to the arbitrator.[8]  The Court disagrees.  Even absent a delegation provision, "courts presume that the parties intend arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration."  *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 34 (2014); *see also Howsam*, 537 U.S. at 85 ("[I]ssues of procedural arbitrability, *i.e.*, whether prerequisites such as time limits, notice, laches, estoppel, *and other conditions precedent* to an obligation to arbitrate have been met, are for the arbitrators to decide") (citation and internal quotation marks omitted) (emphasis added); Restatement (Third) U.S. Law of Int'l Comm. Arb. § 2.18 TD No 4 (Mar. 2020) ("[A]uthority to determine that a precondition to arbitration was not met presumptively resides with the arbitral tribunal.").  In other words, it is not only possible to delegate questions of arbitrability to an arbitrator when a condition precedent exists, but, in fact, even absent an express delegation clause, it is "presume[d]" that an arbitrator and not the court will assess "procedural preconditions for the use of arbitration."  *BG Grp., PLC*, 572 U.S. at 34.

Recently, a sister court in this Circuit analyzed a contract where mediation was a condition precedent to arbitration.  *Morelli v. Alters*, 2020 WL 1285513, *10 (S.D.N.Y. Mar. 18,

---

[7] The Court observes that the provision, closely read, does not actually require the parties to mediate.  It requires that the parties "*endeavor* first to settle the dispute by mediation."  (Dkt. No. 5–2, Exhibit C (emphasis added)).  Because it makes no difference to the analysis, the Court leaves for another day whether the word "endeavor" imposes an obligation only to attempt in good faith to mediate.

[8] "Plaintiffs are not relying on the non-satisfaction of the condition precedent."  (Dkt. No. 39 at 2.)  "Instead, Plaintiffs' argument is that the parties incorporated AAA's arbitration Rules only at the latter arbitration stage after the disputes at issue already have been identified."  (*Id.*)

2020).  Specifically, the contract stated: "[T]he parties to this agreement agree to mediate any disputes with a mutually agreed upon mediator.  If mediation fails to resolve any dispute, the parties agree to arbitrate with a mutually agreed arbitrator or arbitrators."  *Id*. at *3.  Without recourse to any delegation provision, the court concluded that "[t]he issue of whether the parties' failure to mediate frustrated a condition precedent and excuses [the plaintiff] from his duty to arbitrate is a question of procedural arbitrability and thus must be determined by an arbitrator."  *Id.* at *10.  The court explained, "This is a procedural question because it is not a question of whether [the parties] are bound by a duty to arbitrate."  *Id.*

Furthermore, at least one court in this circuit has already determined that a condition precedent of mediation does not preclude a finding that the parties clearly and unmistakably delegated arbitrability to an arbitrator.  In *Katsoris v. WME IMG, LLC*, the relevant part of the contract read:

> Any dispute arising under this Agreement will be first referred for resolution to [certain designees]. To the extent that the designees of the parties cannot resolve the dispute within five (5) business days of referral to them, the parties agree to try in good faith to settle the dispute by non-binding mediation under the Commercial Mediation Rules of the American Arbitration Association before resorting to arbitration . . . . In the event a dispute arises under this Agreement which cannot be resolved through mediation, such dispute will be submitted to arbitration . . . in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect.

237 F. Supp. 3d 92, 97 (S.D.N.Y. 2017).  Like Rule 6(a), the Commercial Arbitration Rules "empower[] the arbitrator to rule on her own jurisdiction."  *Id.* at 104.  Notwithstanding the mediation requirement, which was "a prerequisite to arbitration under the arbitration agreement," the court concluded that "the incorporation of the AAA Rules . . . serve[d] as clear and unmistakable evidence that the [parties] agreed to delegate any questions of arbitrability to the arbitrator."  *Id.* at 102–3, 105 (citing *Contec*, 398 F.3d at 208).  If anything, this case—which

17

involves a broader arbitration provision than that in *Katsoris*—gives even stronger reason to delegate.  Indeed, assuming that the parties' objective here was to clearly and unmistakably delegate arbitrability to the arbitrator, but only if the less-costly mechanism of mediation failed, it is hard to see how a provision could do so any more clearly.

Plaintiffs' reliance on *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC* is misplaced; the case supports *Augustus*.  770 F.3d 1010 (2d Cir. 2014).  In *NASDAQ*, the contract expressed "the parties' intent to submit all disputes to arbitration 'except as provided in the NASDAQ OMX Requirements,'" which—under NASDAQ Rule 4626(a)—"preclude[d] NASDAQ members from seeking compensation for losses attributable to the exchange's handling of securities transactions."  *Id.* at 1033 (citations omitted).  "Because the parties subjected their otherwise broad arbitration agreement to the limitations imposed by NASDAQ rules," the court concluded that "there could not have been any intent to arbitrate claims precluded by Rule 4626(a)."  *Id.* at 1034.  On the question of arbitrability, the court observed that the contract incorporated AAA rules providing for arbitrability to be decided by an arbitrator.  *Id.* at 1032.  But, the court determined, the contract only provided for those AAA rules "to apply to such arbitrations as may arise under the Agreement."  *Id.*  "As noted," the contract "carve[d] out *certain issues* from arbitration, a circumstance that thus delays application of AAA rules until a decision is made as to whether a question does or does not fall within the intended scope of arbitration, in short, until arbitrability is decided."  *Id.* (emphasis added).  The *NASDAQ* court specifically distinguished cases involving "incorporation of AAA rules into an agreement with a broad arbitration clause," which "signal[s] the parties' clear and unmistakable intent to submit arbitrability disputes to arbitration."  *Id.* (citing *Contec*, 398 F.3d at 208).[9]

---

[9] As mentioned above, the arbitration provision in *Shein* had a similar structure.  It specified that "[a]ny dispute arising under or related to this Agreement (except for actions seeking injunctive relief and disputes related to

Plaintiffs argue that the Arbitration Provision's statement that "[o]nly 'unresolved' [claims] are subject to arbitration" is "[l]ike the carve-out in *NASDAQ*" and that "*Contec*" is "inapposite."  (Dkt. No. 39 at 1–2.)  But, as explained above, the "carve-out" for "unresolved" disputes does not reflect an intent to exempt "certain issues," *NASDAQ*, 770 F.3d at 1032, from arbitration; rather, it expresses the procedure to which *all* disputes "arising out of or relating to this contract, or breach thereof" are subject.  (Dkt. No. 5–2, Exhibit C.)  Put differently, all disputes "arising out of or relating to this contract, or breach thereof," without exception, are subject to arbitration with a condition precedent of mediation.  (*Id.*)

To sum, by incorporating Rule 6(a) of the AAA Rules, the parties clearly and unmistakably delegated questions of arbitrability of any dispute "arising out of or relating to [the] contract, or breach thereof" to an arbitrator.  (*Id.*)  The mediation requirement is merely a condition precedent to arbitration of that same category of disputes.  The issue that remains is whether any argument that Plaintiffs have advanced in opposition to arbitration falls outside the delegation provision.

### b.  Whether Plaintiffs' Objections to Arbitration Fall Within Delegation Provision

It is worth reiterating that the Arbitration Provision is of the *Contec* variety: broad.  *Compare Contec*, 398 F.3d at 208 (provision submitting "any controversy arising with respect to this Agreement" to arbitration) *with* Dkt. No. 5–2, Exhibit C (Arbitration Provision submitting

---

trademarks, trade secrets, or other intellectual property of [Schein]), shall be resolved by binding arbitration in accordance with the arbitration rules of the American Arbitration Association."  139 S. Ct. at 528.  The Supreme Court, after determining that courts could not reject a petition for arbitration solely on the basis that the petition's "argument for arbitration was wholly groundless," remanded the case to the Fifth Circuit for determination of whether that specific contractual provision "delegated the arbitrability question to an arbitrator."  *Id.* at 528, 531.  On remand, and citing *NASDAQ*, the Fifth Circuit concluded that "[t]he plain language [of the contract] incorporate[d] the AAA rules—and therefore delegate[d] arbitrability—for all disputes *except* those under the carve-out" and that, "[g]iven that carve-out," the court could not say that the agreement "evidence[d] a 'clear and unmistakable' intent to delegate arbitrability."  *Archer & White Sales, Inc. v. Henry Schein, Inc.*, 935 F.3d 274, 281–82 (5th Cir. 2019).  Here, the Arbitration Provision contains no such carve-out and, accordingly, the opposite result obtains.

any "controversy or claim arising out of or relating to this contract, or breach thereof" to arbitration); *see NASDAQ*, 770 F.3d at 1032 (characterizing *Contec* provision as a "broad arbitration clause").  As Plaintiffs urged in state court, it is "indisputably broad," indeed, "the paradigm of a broad [arbitration] clause."  (Dkt. No. 5–4 at 1–2 (quoting *Collins & Aikman Prod. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995))); *compare Collins*, 58 F.3d at 20 (characterizing as "the paradigm of a broad clause" a provision that submitted to arbitration "[a]ny claim or controversy arising out of or relating to th[e] agreement") *with* Dkt. No. 5–2, Exhibit C (submitting to arbitration "any unresolved controversy or claim arising out of or relating to this contract, or breach thereof").

It is also worth repeating that—putting aside any express delegation provision— "'procedural questions which grow out of [a] dispute and bear on its final disposition' are presumptively *not* for the judge, but for an arbitrator, to decide."  *Howsam*, 537 U.S. at 84 (quoting *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557 (2002) (internal quotation marks omitted)).  The Supreme Court has, in fact, distinguished such "procedural questions" from expressly-delegated "questions of arbitrability."  Specifically, "the Court has found the phrase 'question of arbitrability' *not* applicable in . . . circumstance[s] where parties would likely expect that an arbitrator would decide the gateway matter."  *Id.*; *see also Republic of Ecuador*, 638 F.3d at 393 ("'Questions of arbitrability' is a term of art covering 'dispute[s] about whether the parties are bound by a given arbitration clause' as well as 'disagreement[s] about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy.'") (quoting *Howsam*, 537 U.S. at 84).

Plaintiffs press four reasons why the case should not be arbitrated: (1) Augustus waived its right to arbitrate by actively litigating; (2) the Arbitration Provision violates due process and

lacks fundamentally fair procedures; (3) under California law, Crump cannot be compelled to arbitrate in New York; and (4) some of Plaintiffs' claims are not arbitrable.  The Court discusses each issue in turn, addressing first whether the issue is one for the arbitrator or for the Court and then (in the single instance where it is for the Court) whether Plaintiffs' argument is meritorious.

First, Plaintiffs argue that Augustus waived its right to arbitrate by actively litigating.  As a threshold matter, although one might think otherwise at first glance, this issue is not a procedural question reserved for the arbitrators but instead a question of arbitrability.  In *Howsam*, the Supreme Court held that, as a general matter, "waiver" is a "procedural question[] . . . presumptively *not* for the judge, but for an arbitrator, to decide."  *Howsam*, 537 U.S. at 84 (citation and internal quotation marks omitted); *see id.* at 79–80 (holding that, generally, "parties would likely expect that an *arbitrator* would decide . . . 'allegation[s] of waiver, delay, or a like defense to arbitrability'") (quoting *Moses H. Cone*, 460 U.S. at 24–25 (emphasis added)). However, "*Howsam* did not actually reach the question of litigation-conduct waiver."  *Apple & Eve, LLC v. Yantai N. Andre Juice Co*., 610 F. Supp. 2d 226, 230 (E.D.N.Y. 2009) (internal quotation marks and citation omitted).  "Rather *Howsam* focused upon whether a party waived its arbitration rights by not complying with a contractual time limitation for asserting arbitration."  *Id.* (internal quotation marks and citation omitted).  Thus, even after *Howsam*, several "lower courts have remained reluctant to submit certain waiver issues to arbitrators."  *Id.* (internal quotation marks and citation omitted).

Prior to *Howsam*, the Second Circuit had drawn a distinction between "cases where the waiver defense was based on prior litigation by the party seeking arbitration—when the court should decide the issue of waiver—and those when the defense was based on other actions."  *Doctor's Assocs., Inc. v. Distajo*, 66 F.3d 438, 456 (2d Cir. 1995); *see also Bell v. Cendant*

*Corp*., 293 F.3d 563, 569 (2d Cir. 2002) ("'[O]rdinarily a defense of waiver brought in opposition to a motion to compel arbitration . . . is a matter to be decided by the arbitrator' . . . However, to prevent forum shopping 'the district court [can] properly decide the question when the party seeking arbitration ha[s] already participated in litigation on the dispute.'") (quoting *S & R Co. of Kingston v. Latona Trucking, Inc*., 159 F.3d 80, 82–83 (2d Cir. 1998) (citing *Distajo*, 66 F.3d 438 (2d Cir. 1995))).  This distinction—between waiver based on litigation conduct and waiver based on other conduct—has survived *Howsam*.  *See Syngenta Crop Prot., LLC v. Ins. Co. of N. Am., Inc*., 2018 WL 1587601, at *3 (S.D.N.Y. Mar. 29, 2018) ("This waiver-by-litigation-conduct exception has been carefully circumscribed.").  That is, "courts in this Circuit have continued to apply Second Circuit precedent preceding *Howsam* to address the waiver issue in cases involving litigation conduct before the Court." *Apple & Eve*, 610 F. Supp. 2d at 231; *see also* Philip L. Bruner and Patrick J. O'Connor, Jr., 8 *Bruner & O'Connor Construction Law* § 21:182 (Jan. 2020) ("Given the protean character of 'waiver,' what the Supreme Court was discussing [in *Howsam*] was not the same 'waiver' that had consistently been the purview of the judiciary.").

    For example, in *Meyer v. Uber Techs., Inc*., the Second Circuit stated, "When the party seeking arbitration has participated in litigation regarding the dispute, the district court can properly decide the question of waiver."  868 F.3d 66, 80–81 (2d Cir. 2017) (determining that, "[b]ecause Meyer's waiver argument [wa]s based on defendants' defense of [that] litigation in the district court," waiver was "a question for the district court rather than an arbitrator").

    This distinction made sense prior to *Howsam* and makes sense today.  Where the question is whether the movant has waived the right to compel arbitration by actively litigating, courts and judges have a peculiar expertise—not necessarily shared by arbitrators—in determining the

answer.  *See Apple & Eve*, 610 F. Supp.2d at 230–31 (courts, not arbitrators, "most efficiently and economically decide the issue") (citation and internal quotation marks omitted).  Courts also have a peculiar interest in the answer to that question, because it relates to conduct before a court.

 For the foregoing reasons, the Court concludes courts may properly adjudicate waiver-based objections to arbitration when the type of waiver alleged is that the party seeking arbitration has participated in litigation on the dispute.  Put differently, waiver-by-litigation-conduct is *not* a "procedural question[] . . . presumptively . . . for an arbitrator[] to decide."  *Howsam*, 537 U.S. at 84.

That conclusion does not resolve the matter so much as present whether the non-procedural question of litigation-related waiver can, by clear and unmistakable private agreement, be divested from the court and delegated to an arbitrator.  That issue is open.  *See LG Elecs., Inc. v. Wi-LAN USA, Inc.*, 2014 WL 3610796, at *3 n.3 (S.D.N.Y. July 21, 2014), *aff'd*, 623 F. App'x 568 (2d Cir. 2015) ("The Second Circuit does not appear to have squarely addressed the question of whether litigation-conduct waiver is an issue to be decided by an arbitrator when the parties have agreed to have the arbitrator decide questions of arbitrability.").

The Court concludes that parties cannot delegate to arbitrators the question of whether, under the judge-made principle of litigation-conduct waiver, a party is barred from asserting its right to arbitration.  This conclusion is informed by the same reasons that, after *Howsam*, courts have held that the issue is not one of procedure.  To be sure, in countless circumstances, "it is up to the parties to determine whether a particular matter is primarily for arbitrators or for courts to decide," *BG Grp., PLC*, 572 U.S. at 33–34, and courts will generally enforce such delegations when they are clear and unmistakable.  *See First Options*, 514 U.S. at 945 (quoting *Dean Witter*

*Reynolds Inc. v. Byrd*, 470 U.S. 213, 219–220 (1985) (noting that the "Arbitration Act's basic purpose is to 'ensure judicial enforcement of privately made agreements to arbitrate'"). But that principle is not absolute. At times, "legal constraints external to the parties' agreement" may "foreclose[] . . . arbitration." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc*., 473 U.S. 614, 628 (1985).

Litigation-conduct waiver is one of those times. What goes by the name of "litigation-conduct waiver" is in some ways a form of estoppel. It asks whether the party seeking to compel arbitration should be deprived of that right because it has waited "from when litigation was commenced until the request for arbitration," enjoyed an "amount of litigation to date," and— most importantly—"prejudice[d]" the other side by taking advantage of the tools of litigation and by delaying the motion to compel arbitration. *Louisiana Stadium & Exposition Dist. v. Merrill Lynch, Pierce, Fenner & Smith Inc*., 626 F.3d 156, 159 (2d Cir. 2010) (citation and internal quotation marks omitted).

The "key to waiver analysis is prejudice." *Id.* (quoting *Thyssen, Inc. v. Calypso Shipping Corp*., S.A., 310 F.3d 102, 105 (2d Cir. 2002)). In other words, litigation-conduct waiver focuses on "the inherent unfairness—in terms of delay, expense, or damage to a party's legal position—that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue." *PPG Indus., Inc. v. Webster Auto Parts, Inc*., 128 F.3d 103, 107 (2d Cir. 1997) (quoting *Distajo*, 107 F.3d at 134); *see also Kramer v. Hammond*, 943 F.2d 176, 179 (2d Cir. 1991) ("Prejudice can be substantive, such as when a party loses a motion on the merits and then attempts, in effect, to relitigate the issue by invoking arbitration, or it can be found when a party too long postpones his invocation of his contractual right to arbitration, and thereby causes his adversary to incur unnecessary delay or expense."). As noted above, those issues

implicate the unique expertise and interest of the courts.  When a party raises litigation-conduct waiver, a court is asked to draw on its "inherent power to deal with abusive litigation practices." *Distajo*, 66 F.3d at 456 n.12 (collecting cases in which the court reached the litigation-conduct waiver question and explaining that the decisions "could have been explained" by that power); *see also Goldgroup Res., Inc. v. DynaResource De Mexico, S.A. De C.V.*, 381 F. Supp. 3d 1332, 1349 (D. Colo. 2019) (observing that a courts, not arbitrators, are "expert" in "what litigation conduct is sufficient to waive a party's right to arbitration").

The reasons why a party might have "waived" arbitration by engaging in litigation-related conduct demonstrate that it is the court—and not an arbitrator—who should determine whether the prerequisites of a waiver finding have been satisfied.  Indeed, it is difficult to see how it could be otherwise.  The doctrine is based on prejudice from litigation and the interest of the courts in preventing their processes from being used improperly.  Those interests can be vindicated by the court alone, and for those reasons, "waiver-by-litigation-conduct" appropriately has "been carefully circumscribed" from other types of waiver.  *Syngenta*, 2018 WL 1587601, at *3.  If a party who claimed prejudice from a delayed request for arbitration were relegated to an arbitrator for a hearing on that question, the protection against prejudice would be no protection at all.  In order to receive the purported protection, the prejudiced party would be forced to submit to the very thing that prejudices her: arbitration.  Likewise, if a party, on the eve of trial—or even midway through trial—could in the face of an adverse ruling halt all proceedings and make a spontaneous request for arbitration, it would be no answer to a court concerned with its own docket management to say that an arbitrator will determine the issue of litigation-related waiver (when and if the arbitrator turns to it).  The court must have that power.

Before concluding the waiver analysis, the Court pauses briefly to address a different

section of the AAA Rules.  Under Rule 42(a), "No judicial proceeding by a party relating to the

subject matter of the arbitration shall be deemed a waiver of the party's right to arbitrate."  AAA

Employment Arbitration Rules & Mediation Procedures, *available at*

https://www.adr.org/sites/default/files/EmploymentRules_Web_2.pdf.  In *S & R Co. of Kingston*,

the Second Circuit—for the first time—considered whether such a rule precludes a finding "that

a party has waived arbitration by actively participating in protracted litigation of an arbitrable

dispute."  159 F.3d at 85.  The court concluded that the answer is no.  Such "no-waiver" clauses,

the court explained, are "intended to permit parties to seek provisional remedies or other judicial

proceedings that would not function to displace arbitration on the underlying dispute."  *Id.*  They

are not intended to "permit the losing party to test the water before taking the swim."  *Id.* at 86

(citation omitted).  And they do not, ultimately, "alter the ordinary analysis undertaken to

determine if a party has waived its right to arbitration."  *Id.*  Accordingly, Rule 42(a) of the AAA

Rules is of no moment.  The question of litigation-conduct waiver remains with the Court.[10]

   The foregoing analysis of the elements of litigation-related waiver and the interests

protected by it also answer the question whether Defendant—by initiating and then quickly

dismissing a state court action—waived its right to arbitration.  The answer is no.  (And the

question is not close.)

   Plaintiffs have satisfied none of the three elements necessary to establish litigation-

---

[10] In the alternative, the Court holds that the Arbitration Provision's delegation clause does not delegate litigation-conduct waiver to an arbitrator.  Rule 6(a) of the AAA Rules, titled "Jurisdiction," provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."  AAA Employment Arbitration Rules & Mediation Procedures, *available at* https://www.adr.org/sites/default/files/EmploymentRules_Web_2.pdf.  Litigation-conduct waiver is not a jurisdictional question.  Nor does litigation-conduct waiver relate to the "existence, scope or validity" of the agreement.  Litigation-conduct waiver, in this case, requires no contractual interpretation.  It requires only an examination of the parties' behavior in court.  Accordingly, the parties' delegation agreement provides no evidence—let alone the "clear and unmistakable" evidence that is required, *see Wells Fargo Advisors, LLC v. Sappington*, 884 F.3d 392, 399 (2d Cir. 2018)—to suggest that the parties intended to delegate the litigation-conduct waiver question to an arbitrator.  *Cf. Qazi v. Stage Stores, Inc.*, 2020 WL 1321538, at *5 (S.D. Tex. Mar. 17, 2020) (refusing to delegate litigation-conduct waiver question to arbitrator when delegation clause contained no "clear and unmistakable evidence" of intent to do so).

related waiver: "(1) the time elapsed from when litigation was commenced until the request for arbitration; (2) the amount of litigation to date, including motion practice and discovery; and (3) proof of prejudice." *Merrill Lynch*, 626 F.3d at 159 (quoting *Louis Dreyfus*, 252 F.3d at 229).

First, the time from when litigation commenced to the motion to compel arbitration was under a month. Five days after Plaintiffs filed the instant action, Defendant moved to compel arbitration.

Second, the "amount of litigation to date, including motion practice and discovery" was about as minimal as one could imagine. *Id.* This is not a case where a defendant initiated litigation, took extensive discovery, and then requested arbitration only after litigation started looking unfavorable. *Compare id.* (finding waiver where parties litigated for 11 months, through three amended complaints and various motions, before the plaintiff demanded arbitration following the defendants' submission of a "nineteen-page, single-spaced letter identifying the deficiencies in [the plaintiff's] second amended complaint," which very well might have led to dismissal on the pleadings); *PPG Industries*, 128 F.3d 103 (finding waiver where five months passed between assertion of arbitrable claims and demand for arbitration, and where plaintiff only sought to initiate arbitration following the receipt of interrogatories revealing a "vast amount of information" and after the filing of "substantive motions"); *Kramer*, 943 F.2d 176 (finding waiver after "extensive pre-trial litigation for over four years"). Here, Defendant voluntarily dismissed the state court complaint as soon as Plaintiffs invoked the Arbitration Provision and asked Defendant to do so, and before Plaintiffs were required to substantively respond to the pleading or make any investment in the litigation.

Finally, Plaintiffs have not been prejudiced, at least as that term is used in this context to refer "to the inherent unfairness—in terms of delay, expense, or damage to a party's legal

position—that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue." *PPG Industries*, 128 F.3d at 107 (quoting *Distajo*, 107 F.3d at 134). The only time Defendant might be said to have "force[d]" Plaintiffs "to litigate" was the period of 22 days between Defendant's filing of the state-court complaint and its voluntary dismissal of that complaint. *Id.* In essence, Plaintiffs claim that merely by filing a lawsuit rather than initiating arbitration, Defendant has waived arbitration. The law does not support that result.

For the foregoing reasons, and mindful that "waiver of arbitration is not to be lightly inferred," *id.* (citation and internal quotation marks omitted), the Court concludes that Defendant has not waived its right to arbitrate in this case.

Moving to Plaintiffs' next objection to arbitration, the Court must address who—the Court or an arbitrator—should resolve Plaintiffs' protest that "the arbitration agreements require unfair procedures that deny due process to Plaintiffs." (Dkt. No. 8 at 2.) This due-process argument is analogous to ones that have been raised in the context of class arbitration. *See Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416 (2019) (recognizing that "[c]lass arbitration . . . raises serious due process concerns"). Unlike a procedural issue, the due-process claim is a "substantive" matter and therefore a "question of arbitrability" that "a court should presumptively answer." *Wells Fargo Advisors, LLC v. Sappington*, 884 F.3d 392, 399 (2d Cir. 2018) (characterizing the question of whether an arbitration clause authorized class arbitration). Despite that presumption, the Court "still must consider whether there is clear and unmistakable evidence that the parties intended otherwise based on the language of the clause at issue." *Id.* As explained above, the Arbitration Provision delegates, without qualification or restriction, questions of arbitrability to the arbitrator. This substantive argument falls under that umbrella.

Third is the question of who should decide whether, under California law, Crump can be compelled to arbitrate in New York (as the Arbitration Provision requires).  Crump, arguing in the negative, invokes Cal. Lab. Code § 925 (hereinafter, "Section 925"), which provides that "[a]n employer shall not require an employee who primarily resides and works in California, as a condition of employment, to agree to a provision that would . . . [r]equire the employee to adjudicate outside of California a claim arising in California."[11]  The applicability of Section 925 is a question of the forum provision's "enforceability."  *Alemayehu*, 934 F.3d at 251; *see* Dkt. No. 8 at 20 (Plaintiffs' argument that Section 925 makes the "arbitration agreement . . . *unenforceable* as to Crump").  There is no dispute that the parties agreed to an arbitration provision; the questions are whether it was lawful for Augustus to require the provision and whether Crump has to comply with it.  The enforceability of a contract is a threshold issue that "parties may agree to arbitrate."  *Alemayehu*, 934 F.3d at 251.

Although the precise issue of whether Section 925 is a question of arbitrability that can be delegated seems not to have yet been addressed by a court in this District, California courts have determined that it is.  *See Smith v. Nerium Int'l, LLC*, 2019 WL 7195330, at *4 (C.D. Cal. Sept. 10, 2019) (concluding, where "there was a clear and unmistakable delegation provision," that "arguments regarding the applicability of this provision of the California Labor Code are properly addressed by the arbitrator, not the Court"); *Ratajesak v. New Prime, Inc*., 2019 WL 1771659, at *6 (C.D. Cal. Mar. 20, 2019) ("Plaintiffs' arguments regarding . . . the application of California Labor Code Section 925 . . . may well render the claims unarbitrable. But under the contract, the parties clearly and unmistakably delegated this question to the arbitrator.").  The Court agrees.

Finally, and most straightforwardly, the Court must determine who should resolve the

---

[11] "For purposes of this section, adjudication includes litigation and arbitration."  Cal. Lab. Code § 925(d).

argument that some of Plaintiffs' claims are not arbitrable because they do not arise out of or relate to the Crump or Pacelli Agreements.  That argument is plainly one about the Arbitration Provision's "scope," *Alemayehu*, 934 F.3d at 251, and therefore falls within the delegation provision.

Having resolved the litigation-conduct waiver issue and concluded that Plaintiffs' remaining objections to arbitration must be decided by an arbitrator, the Court grants Defendant's motion to compel arbitration.

## CONCLUSION

Defendant's motion to compel arbitration is GRANTED and this case is STAYED pending the outcome of arbitration. The Clerk of Court is respectfully directed to close Dkt. No. 5 and stay the case.

SO ORDERED.

Dated: May 11, 2020
New York, New York

                               LEWIS J. LIMAN
                       United States District Judge